USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9-8-10

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SAUL ROTHENBERG, EBRAHIM ABOOD, TOBBY   :
KOMBO, KONSTANTINOS KATSIGIANNIS,   :
BOUBACAR DOUMBIA, ROBERT DYCE and   :
MOUSTACH ALI, individually and on behalf of all   :
others similarly situated,   :
  :
                **Plaintiffs,**   :
  :
       - against -   :
  :
MATTHEW DAUS, DIANE MCGRATH-   :
MCKECHNIE, JOSEPH ECKSTEIN, ELIZABETH   :
BONINA, THOMAS COYNE, THE NEW YORK   :
CITY TAXI AND LIMOUSINE COMMISSION, and   :
THE CITY OF NEW YORK,   :
  :
                **Defendants.**   :

**REPORT AND**
**RECOMMENDATION**

**08 Civ. 567 (SHS)(RLE)**

**To the HONORABLE SIDNEY H. STEIN, U.S.D.J.:**

## I. INTRODUCTION

Plaintiffs individually and on behalf of all others similarly situated filed their Amended

Complaint against TLC Chairperson Matthew Daus, former TLC Chairperson Diane McGrath-

McKechnie, former TLC Deputy Commissioner Joseph Eckstein, Chief Administrative Law

Judge ("ALJ") of the TLC Elizabeth Bonina, Deputy Chief ALJ Thomas Coyne, The New York

City Taxi and Limousine Commission ("TLC" or "Commission"), and The City of New York

("City"), on September 24, 2009. Plaintiffs bring the instant action under the Fourth, Fifth, and

Fourteenth Amendments to the Constitution of the United States and 42 U.S.C. § 1983, and

under the New York State Constitution and New York law. (Am. Compl. ¶¶ 5, 6, 138-39, 142-43,

146.) They seek an order for injunctive relief from this Court directing Defendants to reinstate

the taxi driver licenses of Plaintiffs and those similarly situated. (*Id.* at 31 ¶ F.) Plaintiffs also

seek a judgment declaring that the TLC's revocation policies and procedures are unconstitutional and violate state law. (*Id.* ¶¶ B-D.) Finally, Plaintiffs seek compensatory and punitive damages. (*Id.* ¶¶ H, I.)

Before the Court are two separate motions for summary judgment by Plaintiffs (Doc. Nos. 48 & 78) and a motion for summary judgment by Defendants (Doc. No. 76). For the reasons that follow, I recommend that Defendants' Motion be **GRANTED**, and Plaintiffs' Motions be **DENIED**, and that the Complaint be **DISMISSED** in its entirety. Specifically, I recommend that: 1) Defendants' Motion for Summary Judgment be granted as to the federal claims; 2) Plaintiffs' Motion for Summary Judgment be denied as to the federal claims; 3) Plaintiffs' state claims be dismissed for lack of supplemental jurisdiction; 4) Plaintiffs' claims against agency Defendant TLC be dismissed; and 5) Plaintiffs' claims against individual Defendants Daus, McGrath-McKechnie, Eckstein, Bonina, and Coyne, in their individual and official capacities, be dismissed.

## II. BACKGROUND

Defendant TLC has broad authority to regulate and supervise the New York taxi industry, and to establish standards and criteria for the licensing of drivers. *See* New York City Charter ("N.Y. Charter"), ch. 65, §§ 2300, 2303(a) (2009). In order to obtain a taxicab driver's license or a for-hire vehicle ("FHV") driver's license, each applicant must: "1) Hold a New York state chauffeur's license; 2) Be nineteen years of age or over; 3) Be of sound physical condition with good eyesight and no epilepsy, vertigo, heart trouble or any other infirmity of body or mind which might render him or her unfit for the safe operation of a licensed vehicle; 4) Be

fingerprinted; 5) Be of good moral character; [and] 6) Not be addicted to the use of drugs or

intoxicating liquors." New York City Administrative Code ("N.Y. Code") § 19-505(b) (2009).[1]

The TLC has the authority to revoke a license when it becomes aware of information that

the driver no longer meets the requirements for a taxicab driver's license. Rules & Regulations of

the City of New York, Tit. 35, § 2-02(f) ("35 RCNY § __") (2009). The N.Y. Code allows for

notice and opportunity for a hearing before revocation:

> The commission may, for good cause shown relating to a direct and substantial threat to
> the public health or safety and prior to giving notice and an opportunity for a hearing,
> suspend a taxicab or for-hire vehicle license . . . and, after notice and an opportunity for a
> hearing, suspend or revoke such license. The commission may also, without having
> suspended a taxicab or for-hire vehicle license, issue a determination to seek suspension
> or revocation of such license and after notice and an opportunity for a hearing, suspend or
> revoke such license.

N.Y. Code § 19-512.1(a).

This hearing can take the form of a "fitness hearing" conducted before an ALJ. *Id.* at § 8-

15(a). The TLC must notify the driver of the "date, time and location of the hearing and the basis

for the Commission's charge that the [driver] fails to meet the minimum requirements for

licensure." *Id.* at § 8-15(b). The ALJ "review[s] the documentary evidence and testimony

submitted by the Commission and afford[s] the driver an opportunity to respond under oath and

to proffer evidence on his or her behalf."[2] *Id.* at § 8-15(d). The ALJ issues a Recommended

Decision, which includes a determination of the driver's fitness to continue to possess a license.

*Id.* at § 8-15(e). The Chairperson reviews the Recommendation, and may accept, reject or modify

it. *Id.* The Chairperson's decision is the final determination of the Commission. *Id.* The

---

[1] Applicants also must pay a licensing fee, provide two recent photos, be examined as to his or her physical
condition, and be examined as to his or her knowledge of the city and pertinent laws. N.Y. Code. § 19-505(c)-(e).
[2] In 2007, the TLC transferred the function of adjudicating license revocations based upon criminal convictions
(effective June 29, 2007), and positive drug testing (effective August 31, 2007), to the New York City Office of
Administrative Trials and Hearings ("OATH"). (Am. Compl. ¶ 104; *Nnebe v. Daus*, 665 F. Supp. 2d 311 (S.D.N.Y.
2009); Declaration of Marc T. Hardekopf, Pls.' Ex. 40, ¶¶ 8-9.) OATH, a City agency, employs ALJs who hear
cases from a variety of City agencies. (Am. Compl. ¶ 104.) Plaintiffs' fitness hearings occurred prior to the OATH
transfers. (Am. Compl. ¶¶ 111-34.)

Commission may also revoke a license at any time during the term of a taxicab driver's license when it becomes aware of information that the driver no longer meets the requirements. *Id.* at § 2-02(f).

In addition to drug testing for all applicants prior to licensure, 35 RCNY § 2-02(i), the TLC requires licensees to undergo annual drug testing, 35 RCNY § 2-02(i). If the licensee's test results are positive, the TLC may revoke the driver's license after a fitness hearing in accordance with § 8-15. *Id.* at § 2-19(b)(2). For criminal convictions, the TLC requires all applicants to be fingerprinted and have their criminal history reviewed. N.Y. Code § 19-505(b)(4); 35 RCNY § 2-02(c). After licensure, a driver must notify the TLC within fifteen days of a criminal conviction, and deliver a certified copy of the certificate of disposition within fifteen days of sentencing. *Id.* at § 2-63(a).

Plaintiffs are formerly licensed taxicab drivers who had their licenses to operate a medallion (yellow) taxicab or a FHV, revoked based on either a falied drug test or a criminal conviction. (Am. Compl. ¶¶ 10-16.) Ali is the only named plaintiff who held a FHV license. (Defs.' Reply Memo in Further Support of their Mot. for Summ. J. and in Opp. to Pls.' Cross-Motion for Summ. J., at 1; Ex. D113.) Rothenberg, Abood, Katsigiannis, and Doumbia, all had their licenses revoked after failing drug tests. (*Id.* ¶¶ 10-11, 13-14.) Kombo's license was revoked because of a conviction for assault in the second degree (*Id.* ¶ 12; Defs.' Ex. D27.) Dyce's license was revoked for possession and use of a forged instrument in relation to his capacity as an ordained minister. (*Id.* ¶ 15; Defs.' Ex. D96.) Ali's license was revoked for a conviction for driving his personal car while ability impaired. (*Id.* ¶ 16; Defs.' Ex. D108.)

4

## III. DISCUSSION

**A.    Legal Standard**

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper if the record shows that there is no genuine issue as to any material fact, and that the moving party is entitled to a judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Only disputes over facts that might affect the outcome of the suit under the governing substantive law are material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issue of material fact. *See Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568 (2d Cir. 1993) (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). When considering cross-motions for summary judgment in which both parties assert an absence of a genuine issue of material fact, a court need not enter a judgment for either party, but must examine each motion separately and, in each case, draw all reasonable inferences against the moving party. *Padberg v. McGrath-McKechnie*, 203 F. Supp. 2d 261, 274 (E.D.N.Y. 2002) (*citing Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 122 (2d Cir. 2001); *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993)). Summary judgment is appropriate where no reasonable trier of fact could find in favor of the non-moving party, *H. L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1011 (2d Cir. 1989), thereby "dispos[ing] of meritless claims before becoming entrenched in a frivolous and costly trial." *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 58 (2d Cir. 1987).

**B.    Summary Judgment Should be Granted in Favor of Defendants on the Federal Claims**

     **1.    Due Process Claims Under § 1983**

"To prevail on a § 1983 claim, a plaintiff must prove (1) that the challenged practices are attributable, at least in part, to a person acting under color of state law and (2) that the challenged practices deprive the plaintiffs of a right, privilege or immunity secured by the Constitution or laws of the United States." *Padberg*, 203 F. Supp. 2d at 276 (*citing Wimmer v. Suffolk County Police Dep't*, 176 F.3d 125, 136-37 (2d Cir. 1999). Plaintiffs cannot prevail on their § 1983 claim because the challenged policies and practices did not deprive Plaintiffs of their due process rights. Plaintiffs bring three federal due process claims under the Fourteenth Amendment to the United States Constitution. First, they assert that "[b]ecause of the nature of their employment and compensation, TLC judges in fitness hearings are systematically biased in favor of the agency" and the hearings themselves are inconsistent with due process of law. (Am. Compl. ¶ 137.) Second, they contend that the fitness hearings are "sham hearings" and not "meaningful." (Am. Compl. ¶ 142.) Finally, they claim that the TLC failed to give fair notice because "former taxi drivers may have their license applications denied without published standards established by law." (Am. Compl. ¶ 146.)

     **2.    Plaintiffs Have a Protected Property Interest in Their Taxi Licenses**

The Due Process Clause of the Fourteenth Amendment provides that no state may "deprive any person of life, liberty, or property, without due process of law[.]" U.S. CONST. amend. XIV, § 1. In order to assert a violation of procedural due process, a plaintiff must "first identify a property right, second show that the state has deprived him of that right, and third show that the deprivation was effected without due process." *Local 342, Long Island Pub. Serv. Employees v. Town Bd. of Huntington*, 31 F.3d 1191, 1194 (2d Cir. 1994). First, "[i]t is

6

undisputed that a taxi driver has a protected property interest in his license sufficient to trigger

due process protection." *Nnebe*, 665 F. Supp. 2d at 323; *Padberg*, 203 F. Supp. 2d at 276. *Bell v.*

*Burson*, 402 U.S. 535, 539 (1971). Second, since the TLC, a municipal agency, revoked

Plaintiffs' licenses, there is no question of deprivation by the state.

### 3. The TLC Provided Plaintiffs with Sufficient Pre-Deprivation Due Process

"Due process is flexible and calls for such procedural protections as the particular

situation demands." *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (*citing Morrissey v. Brewer*,

408 U.S. 471, 481 (1972)). Accordingly, not all situations requiring for procedural safeguards

necessitate the same kind of procedure. In most cases, "something less than a full evidentiary

hearing is sufficient prior to adverse administrative action." *Bell*, 402 U.S. 535 (finding less than

a full evidentiary hearing sufficient for revocation of state-granted driver's license); *Mathews*,

424 U.S. 319 (1976) (termination of social security benefits); *Cleveland Bd. of Educ. v.*

*Loudermill*, 470 U.S. 532 (1985) (termination of public employee). While deprivation of certain

interests, such as welfare benefits, requires a pre-deprivation hearing closely approximating a

judicial trial, *Goldberg v. Kelly*, 397 U.S. 254 (1970), Plaintiffs are not entitled to a full

adversarial hearing before the TLC, *see Nnebe*, 665 F. Supp. 2d at 328.

Determining the process due in a given situation requires a balancing of the interests

involved. While Plaintiffs have a strong interest in retaining their taxicab licenses as a means of

their livelihood, the TLC also has an interest in licensing satisfactory taxicab drivers, *see*

*Loudermill*, 470 U.S. at 542-43, and protecting the public welfare. First, the Court must consider

"the private interest that will be affected by the official action; second, the risk of an erroneous

deprivation of such interest through the procedures used, and the probable value, if any, of

additional or substitute procedural safeguards; and third, the Government's interest, including the

function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335.

### a. Plaintiffs have a strong interest in their licenses

An individual has a heightened interest in a license if it is essential for employment. *Bell*, 402 U.S. at 537 (clergyman's driver's license used for ministry to three rural communities); *Spinelli v. City of N.Y.*, 579 F.3d 160, 171 (2d Cir. 2009) (gun shop owner's license); *Turco v. Monroe County Bar Ass'n*, 554 F.2d 515 (App. Div. 1975) (attorney's license). Plaintiffs have a strong private interest in their licenses because they are necessary for the pursuit of their livelihood. *Padberg*, 203 F. Supp. 2d at 278 (*citing Bell*, 402 U.S. 535).

### b. Plaintiffs had fair notice and opportunity to be heard

"Procedural due process rules are shaped by the risk of error inherent in the truthfinding process as applied to the generality of cases, not the rare exceptions." *Mathews*, 424 U.S. at 344. Plaintiffs assert that the TLC procedures currently in place did not adequately afford Plaintiffs due process because there was a lack of notice and a meaningful hearing (Am. Compl. ¶¶137, 142, 146). While Plaintiffs are not entitled to a full adversarial hearing before the TLC, they are entitled to fair notice and opportunity to be heard in order to reduce the risk of erroneous deprivation.

#### 1. Plaintiffs had fair notice

##### a. *Except for Dyce, Plaintiffs had adequate statutory notice*

Plaintiffs assert that Defendants have deprived them of fair notice because "former taxi drivers may have their licenses revoked without published standards established by law." (Am. Compl. ¶ 146.) They allege that the TLC never issued public notice of its drug test or criminal

conviction revocation policies, (*Id.* ¶ 97), and that there is no statute or TLC rule requiring or permitting the revocation policy (*Id.* ¶ 65, 66).

### i.    Drug Testing

Rothenberg, Abood, Katsigiannis, and Doumbia, all had their licenses revoked in response to positive annual drug tests. (*Id.* ¶¶ 10-11, 13-14.) Rothenberg, Abood, and Doumbia tested positive for marijuana and Katsigiannis tested positive for cocaine. (*Id.* ¶¶ 112, 116, 120, 124.) The TLC rules provide that it may test a driver for drugs if it has a reasonable suspicion to believe that a driver has an impairment that renders him or her unfit to safely operate a taxicab. 35 RCNY § 2-19(a). In addition to § 2-19(a), each licensee must be tested annually for drugs or controlled substances as set forth in § 3306 of the Public Health Law. *Id.* at § 2-19(b)(1). If the test results are positive, the driver's license "may be revoked" after a fitness hearing. *Id.* at § 2-19(b)(2). The purpose of the drug testing rules is to provide a "drug-free driving force ensur[ing] the health and safety of passengers, other motorists and pedestrians in the City of New York." 35 RCNY § 2-19, Statement of Basis and Purpose in City Record, Nov. 21, 2005.

35 RCNY § 2-19(b)(2) puts a licensee on notice that he is required to take an annual drug test, and that upon failing such a test, his license may be revoked. *Fung v. Daus*, 846 N.Y.S.2d 104 (App. Div. 2007). While Plaintiffs assert that there is insufficient notice as to which drugs or controlled substances are prohibited (Am. Compl. ¶ 44), Public Health Law § 3306 lists prohibited drugs and controlled substances including marijuana and cocaine. Plaintiffs' claim that the TLC rules do not require or permit "suspicionless drug testing" (*Id.* ¶ 43) is without merit because, notwithstanding the reasonable suspicion drug testing, the TLC requires each licensee to submit to mandatory drug tests annually. 35 RCNY § 2-19(b)(1). An annual, mandatory drug test is inherently "suspicionless" in that the TLC administers it according to

protocol, in the absence of individual suspicion. In addition, Plaintiffs' claim that there is insufficient notice as to what constitutes a drug test failure (Am. Compl. ¶ 44), also fails because a reasonable taxicab driver familiar with the rules should be aware that any amount of an illegal substance warrants a drug test failure. In any case, the TLC has a zero-tolerance approach to illegal drug use.[3]

Plaintiffs have safety-related jobs that require them to be drug-free. They are given driver's manuals including drug-testing rules, and are required to pass an examination about these rules. *See* 35 RCNY § 2-02(c); (Abood Dep., Defs.' Ex. D178, 13:22-15:13; Katsigiannis Dep. Defs.' Ex. D179, 68:15-69:6.) Plaintiffs have sufficient notice of the drug testing requirements as they are easily accessible, along with all other TLC rules, on the TLC website.[4]

Plaintiffs also assert that the TLC does not allege or attempt to prove drug use in accordance with already established rules such as: that the driver was under the influence of illegal drugs while driving his taxi (35 RCNY § 2-20); or that the driver used the illegal drugs within six hours of driving his taxi (35 RCNY § 2-20); or that the driver is addicted to drugs or alcohol (N.Y. Code § 19-505(b)(6)). (Am. Compl. ¶¶ 48, 51.) Plaintiffs' claim ignores the purpose behind these rules. Since the TLC's objective is to license drivers who are not using drugs or alcohol, the zero tolerance drug testing policy is a logical and reasonable way to test and enforce the objective. 35 RCNY § 2-19, Statement of Basis and Purpose in City Record, Nov. 21, 2005 (using the non-addiction rule as a guideline, the TLC required that all drivers annually submit to a drug test as proof that they are not using drugs or alcohol). A positive drug test is one

---

[3] Various drug-related rules including 35 RCNY § 2-02(i), § 2-19(a), § 6-15(a)(3), § 6-16, § 2-20(a), Statement of Basis and Purpose in City Record, June, 26, 1998, Defs.' Ex. D143 ("[t]he regulations clearly establish a Commission policy of zero tolerance for licensees who use illegal substances, or who operate their vehicles while their ability to do so is impaired by substances, whether or not illegal.").
[4] Important Information About Drug Testing Requirements, http://www.nyc.gov/html/tlc/html/licenses/drivers.shtml, (Defs.' Ex. 64)

way to prove addiction to drugs or intoxicating liquors, and it serves as sufficient proof of possible use in relation to work or addiction. For these reasons, there is no genuine issue of material fact as to the adequacy of notice given to Plaintiffs regarding drug testing.

### ii.   Criminal Convictions

Plaintiffs assert that the TLC never issued public notice of its criminal conviction revocation policies, (*Id.* ¶ 97), and that, though there is no published law or rule, TLC judges assume that any driver convicted of a crime shall have his license revoked, (*Id.* ¶ 58). A law or regulation whose violation could lead to a due process deprivation " 'must be crafted with sufficient clarity to give the person of ordinary intelligence a reasonable opportunity to know what is prohibited and to provide explicit standards for those who apply them.' " *Nnebe*, 665 F. Supp. 3d at 332 (*quoting Piscottano v. Murphy*, 511 F.3d 247, 280 (2d Cir. 2007)). In the context of agency regulations, it is enough that "a reasonably prudent person, familiar with the conditions the regulations are meant to address and the objective the regulations are meant to achieve, has fair warning of what the regulations require." *Padberg*, 203 F. Supp. 2d at 286-87 (*citing Rock of Ages Corp. v. Sec'y of Labor*, 170 F.3d 148, 156 (2d Cir. 1999)).

In *Nnebe*, taxicab drivers had their licenses suspended upon notification of arrest for misdemeanor assault or, in one case, felony contempt and trespass. *Nnebe*, 665 F. Supp. 3d at 318-19. Although the drivers' criminal charges were dropped and their licenses were reinstated, they brought suit asserting that TLC's summary suspension policy violated their due process rights because they lacked notice that their license would be suspended upon arrest for specified crimes. *Id.* at 332. The court found that since all drivers are fingerprinted as part of the license application process under N.Y. Code § 19-505(b)(4), there was sufficient notice that the TLC might learn of plaintiffs' arrests. *Id.* And since it is within the intelligence of an ordinary licensee

11

to understand that their arrest for a violent or felony offense might be deemed a threat to public safety, whether or not they had access to the list of offenses that would result in suspension, those plaintiffs were on notice that their arrests were sufficient to warrant suspension. *Id.* at 332-33.

Here, Plaintiffs similarly had sufficient notice that the TLC would learn of any criminal conviction because licensees must notify the TLC in writing of a criminal conviction within 15 days of conviction, and deliver a certified copy of the certificate of disposition within 15 days of sentencing. 35 RCNY § 2-63(a). They also had sufficient notice, under N.Y. Code § 19-512.1(a), that the TLC "may revoke any license where the licensee constitutes a threat to the public health, or safety." *TLC v. Fuentes*, OATH Index No. 201/08 (Aug. 28, 2007). General provisions, such as N.Y. Code § 19-512.1(a), do not violate due process where the plaintiff's conduct has clearly fallen within the ambit of the provision, regardless of whether other conduct might present a more questionable case. *Id.*; *Piscottano*, 511 F.3d at 280-84 (rejecting vagueness challenge to a regulation that penalized any behavior that "could . . . reflect negatively on the Department of Correction" because it was not beyond the intelligence of a correctional officer to recognize that his association with an organization affiliated with criminal activity reflected negatively on the agency" (internal citations omitted)); *Fernandez v. TLC*, 193 A.D.2d 423 (App. Div. 1993) (rejecting vagueness challenge to 35 RCNY § 2-61(a)(2), which states that drivers shall not engage in behavior which is "against the best interests of the public" where licensee harassed, made sexual comments to and grabbed a female passenger in his taxicab). Likewise, a reasonably prudent licensee has fair warning that convictions for felony assault or driving while ability impaired might be deemed a threat to public safety sufficient to warrant revocation.

Kombo's license was revoked because of a conviction of second degree assault, (*id.* ¶ 12), a class D felony, N.Y. Penal Law § 120.5. While an assault of a non-passenger occurring when the taxi driver is off-duty is arguably not "job-related," given the great trust that passengers place in taxi drivers, it is within the TLC's prerogative to conclude that any violent or other serious criminal conduct is necessarily related to the driver's job. *Nnebe*, 665 F. Supp. 3d at 327. Proof of an arrest for second degree assault poses a threat to the public safety. *TLC v. Chaudhry*, OATH Index No. 1012/08 (Nov. 30, 2007). As a result, Kombo had fair warning that his actions could lead to revocation of his taxicab license.

Ali's license was revoked because of a conviction for driving his personal car while ability impaired. (*Id.* ¶16.) He was licensed to operate a FHV, which are prohibited from accepting street hails. 35 RCNY § 6-01. FHV operators must inform the TLC *immediately* when convicted of any crime. 35 RCNY § 6-15(e). If a FHV operator is convicted for any serious criminal offense as set forth in New York Vehicle and Traffic ("VAT") Law § 498.1(f), the license "*shall be revoked*" after notice and hearing. *Id.* Although driving while ability impaired does not constitute a "serious criminal offense," Ali's conviction is still subject to discretionary review by the TLC. 35 RCNY § 6-15(e) leads a reasonable FHV licensee to believe that his license could be revoked for crimes other than the "serious criminal offense[s]" listed in the VAT. While Ali asserts that there is no TLC rule or Code provision allowing revocation where a taxi driver is found to be intoxicated while driving off duty, (Pls.' Mot. for Partial Summ. J., 12), the TLC has held otherwise. *TLC v. Padro*, OATH Index No. 798/08 (Oct. 31, 2007) (finding revocation proper because licensee's conviction for driving his personal car while ability impaired by alcohol established the driver posed a risk to public safety), Comm'r/Chair's Dec. (Nov. 19, 2007) (affirming revocation on the ground that conviction for violation alone

established licensee was unfit). Ali had fair warning that driving while ability impaired might be deemed a threat to public safety sufficient to lead to license revocation.

Dyce's license was revoked because of a misdemeanor conviction involving an improper designation on a parking badge he used in his capacity as an ordained minister. (*Id.* ¶ 15.) The TLC rules state that "[a] driver, while performing his duties and responsibilities as a driver, shall not commit or attempt to commit . . . any act of fraud, misrepresentation or larceny against a passenger, Commission representative, public servant or any other person," 35 RCNY § 2-61(a)(1). It is not clear how this rule, in itself, provided Dyce with sufficient notice that his actions might result in license revocation, or that his offense is related to his work. There remains a dispute of material fact as to the sufficiency of the statutory notice given Dyce.

Plaintiffs assert that there is no statute or TLC rule requiring or permitting the revocation policy (*Id.* ¶ 65, 66.) This claim is without merit. As mentioned above, under N.Y. Code § 19-512.1 the TLC may revoke any license "for good cause shown relating to a direct and substantial threat to the public health or safety." Also, under 35 RCNY § 2-02(f), the TLC may revoke a taxicab driver's license if it becomes aware of information that the driver no longer meets the requirements. 35 RCNY § 2-02(f) is authorized under § 2303(a)(b) of the Charter of the City of New York, which empowers the TLC to regulate and supervise the vehicles for-hire industry, and to promulgate rules and regulations relating to the issuance of licenses; under N.Y. Code § 19-503, authorizing the TLC to promulgate rules and regulations necessary to exercise authority conferred upon it by the Charter; and under N.Y. Code § 19-505, authorizing the TLC to establish criteria for licensure.

Rothenberg, Abood, Kombo, Katsigiannis, Doumbia, and Ali all had sufficient notice that their actions could lead to license revocation. The Court recommends that there is no genuine

issue of material fact as to their statutory notice claims. To the extent that Plaintiffs' claims might be construed as a facial challenge to the rules, their claim must fail. A plaintiff whose conduct is proscribed by the statute may not bring a facial vagueness challenge. *Padberg*, 203 F. Supp. at 287 (*citing Vill. of Hoffman Estates v. Flipside*, 455 U.S.489, 495 (1982). Dyce's statutory notice claim remains disputed.

### b.  *Plaintiffs had fair notice of hearings*

Plaintiffs also assert that the TLC provided insufficient notice of their hearings by omitting statements of the legal authority and jurisdiction under which the hearing was to be held, reference to particular sections of law or rules, and a short and plain statement of the matters to be adjudicated. (Am. Compl. ¶ 100.) Fair notice must set forth the alleged misconduct with particularity. *Spinelli*, 579 F.3d at 171-72 (*citing In re Gault*, 387 U.S. 1, 33 (1967). "The particularity with which alleged misconduct must be described varies with the facts and circumstances of the individual case; however, due process notice contemplates specifications of acts or patterns of conduct, not general, conclusory charges unsupported by specific factual allegations." *Id.* at 172.

In *Spinelli*, the license suspension notice provided by the New York Police Department License Division to plaintiff gun dealer was constitutionally inadequate. *Id.* The police officer who initially inspected the gun shop and shooting range noted safety infractions such as an unwatched counter area, a large hole in the backyard fence, and two unlocked safes. *Id.* at 164. However, notice letters sent to the plaintiff did not specify any of these infractions. *Id.* Rather, the letters provided only conclusory statements indicating suspension due to "failure to provide adequate security." *Id.* at 164, 172.  The court found the notice given to the plaintiff failed to " 'reasonably . . . convey the required information' " that would permit her to " 'present [her]

objections' " to the City. *Id.* (*quoting Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)).

Unlike *Spinelli*, the TLC provided Plaintiffs with specific grounds for their appearance at their fitness hearings. The TLC's notices to Rothenberg, Abood, Doumbia, and Katsigiannis, each stated that the purpose of the hearing was "to determine [the licensee's] fitness to maintain a TLC licenses in light of [his] positive drug test result." (Defs' Ex. D7, D8, D19, D126, D134.) The notices also instructed that the licensee could submit medical evidence that medication could have caused the positive result, and that the licensee had a right to request a retest of the original specimen from a different laboratory. *Id.*

The TLC issued suspension notices upon arrest and fitness hearing notices upon conviction to Kombo, Dyce, and Ali. (Defs.' Ex. D27, D29, D96, D98, D108, D110.) Their suspension notices stated the dates of their arrests and their crimes. (Defs.' Ex. D27, D96, D108.) The notices indicated that if the drivers were found guilty, the TLC might initiate proceedings to revoke their licenses based upon a determination that they were not fit to possess a TLC license. *Id.*

All Plaintiffs' notices stated that a license revocation recommendation might be given as a result of the hearing, that the licensee could bring legal representation to the hearing, and that the licensee could present evidence and witnesses in his defense. (Defs' Ex. D7, D8, D19, D, 29, D98, D110, D126, D134.) Given the nature of Plaintiffs' violations, the Court finds that the notices set forth the alleged misconduct with particularity, and that Plaintiffs were given enough information to adequately present their objections and defenses to the TLC. For these reasons, there is no genuine issue of material fact as to the adequacy of the hearing notices.

16

### 2. Plaintiffs Had a Sufficient Opportunity to be Heard

#### a. *Adequacy of fitness hearings*

Plaintiffs assert that drivers are subject to a standardless fitness review and may be denied a license even where the conviction is unrelated to driving a taxi. (Am. Compl. ¶ 63.) They assert that, as a matter of policy and practice, the license revocation is automatic and the hearing is pre-ordained. (Am. Compl. ¶¶ 47, 49, 68.)

### i. Drug testing

Plaintiffs assert that the TLC allows no witnesses or evidence apart from a form indicating the drug test results, and no opportunity to cross-examine anyone involved in the sample collection, the chain of custody, or the testing itself. (*Id.* ¶¶ 50, 178.) Despite Plaintiffs' claim, "[d]ue process does not require that in every case of a positive [drug] test result the employer produce at its own expense the individuals responsible for overseeing and administering the drug testing program." *Griffin v. Long Island R.R.*, 1988 U.S. Dist. LEXIS 19336, *64 (E.D.N.Y. June 5, 1988); *see also Fung*, 846 N.Y.S.2d at 104 (finding no basis for claim that the TLC should have provided licensee at least one witness for cross-examination at hearing based on positive drug test for marijuana).

Risk of erroneous deprivation is reduced when it is based on an objectively verifiable piece of evidence such as a positive drug test. *See Padberg*, 203 F. Supp. 2d at 279 (*citing Barry*, 443 U.S. at 65-66). Documentary evidence including an affidavit from a toxicologist, with accompanying chain of custody form, toxicology reports and a confirmation from a medical review officer, is sufficiently reliable by itself without witness testimony to establish a prima facie case that a licensee's urine tested positive for drugs. *TLC v. Shakoor*, OATH Index No 860/08 (Nov. 30, 2007). Such documentary evidence constitutes substantial evidence, *Fung*, 846

17

N.Y.S.2d at 104, i.e., "relevant proof [that] a reasonable mind may accept as adequate to support a conclusion or ultimate fact." *300 Gramatan Ave. Assoc. v. State Div. of Human Rights*, 379 N.E.2d 1183, 1186 (N.Y.1978). An Article 78 proceeding is the proper venue to challenge whether a determination made as a result of a hearing is supported by substantial evidence. N.Y. CPLR § 7803(4) (McKinney 2008).

Plaintiffs' assertion that license revocation is "automatic" and the hearing is "pre-ordained" lacks merit. TLC judges have allowed drivers adjournments to provide medical documentation to explain the positive drug test result, or to call additional witnesses. (Defs.' Opp'n to Pls.' Mot. for Partial Summ. J. 15.) In the event the medical review officer determines that the medical documentation is sufficient to explain the positive drug result, the TLC would withdraw the case from hearing, and reinstate the license. (*Id.*; Eckstein Decl. ¶ 5.) Also, it is unclear what value if any would be added to the process if the TLC routinely requested drug testing witnesses to be cross-examined about information readily available in the documentary evidence. Thus, Rothenberg, Abood, Katsigiannis, and Doumbia, were all afforded a meaningful opportunity to be heard through their fitness hearings.

### ii.  Criminal convictions

In revocation hearings based on criminal convictions, the TLC prosecutor submits the certificate of disposition from the New York State Department of Criminal Justice Services ("DCJS") of the driver's conviction, and presents an argument that the conviction has a sufficient nexus to the driver's fitness to operate a taxicab. (Defs.' Opp'n to Pls.' Mot. for Partial Summ. J. 10; Defs.' Mot. for Summ. J. 8; Defs.' 56.1 ¶ 41.) If the ALJ determines that there is a factual connection between the conviction and the licensed activity, the ALJ will seek to revoke the license at a fitness hearing. (Eckstein 9/29/08 Dep. Tr. at 68-69, Ex. D44; Hardekopf 10/08/08

18

Dep. Tr. at 34, 78-79, 104-05, Ex. D49; Fraser 04/09/09 Dep. Tr. at 13, Ex. D51; Weinblatt Decl. ¶ 67; Hardekopf Decl. ¶ 18; Fraser Decl. ¶ 31.)

For Kombo, ALJ Schwartz recommended revocation because he found that Kombo's conviction for assault in the second degree had a direct relationship to his ability to safely transport the riding public. (Recommendation to the TLC Chairperson, Defs' Ex. D36.) For Dyce, ALJ Fioramonti recommended revocation because he found that, in light of being convicted of criminal possession of a forged instrument in the Third Degree, Dyce possessed a forged instrument with intent to defraud or deceive another, and that his actions had a "direct bearing on his ability to comply with TLC Rules and Regulations and thus to operate a taxi in a lawful manner." (Recommendation to the TLC Chairperson, Defs.' Ex.103.) ALJ Rivers recommended revocation for Ali because he found Ali's conviction of DWAI to be "a very serious offense that is directly related to his ability to carry out the responsibilities of a FHV driver and to whether he can be entrusted with the safety of passengers and abide by governing rules and regulations. (Recommendation to the TLC Chairperson, Defs.' Ex. D114.) Kombo, Dyce and Ali's convictions were determined by an independent entity (e.g., the Supreme or Criminal Courts), and pursuant to guilty pleas. (Defs.' Mot. for Summ. J. 8; Defs.' 56.1 ¶ 185, 202, 217.)

Plaintiffs assert that the TLC should present additional evidence at the fitness hearings, such as the driver's prior record (i.e., criminal record, driving record, personal history), the circumstances of the alleged crime, or whether the crime occurred while the driver was driving his taxi (see Am. Compl. ¶¶ 64, 69). The Court disagrees. The TLC's burden is to present valid evidence that the licensee has engaged in conduct that calls into question the licensee's fitness to retain a license. The licensee may introduce evidence to explain or mitigate the significance of the criminal conviction. *Id.* at 518 n.5 (*citing Matter of Levy*, 333 N.E.2d 350, 352 (N.Y. 1975))

(upholding exclusion of plaintiff's testimony on question of guilt and refusing to remit case because the attorney did not avail himself of the opportunity to present evidence in mitigation during his disciplinary proceeding).

Plaintiffs had the opportunity to introduce mitigation evidence at their fitness hearings, but they failed to do so. Once the TLC has adduced evidence to demonstrate that the conviction had a sufficient nexus to the driver's fitness to operate a taxicab, the burden shifts to the licensee to present evidence in mitigation. There is no genuine issue of material fact as to the adequacy of the hearings provided to Plaintiffs because they had an opportunity to introduce information they deemed relevant, and there is a no allegation that they were deprived of such opportunity.

### b. Bias of TLC ALJs

Plaintiffs also assert that "[b]ecause of the nature of their employment and compensation, TLC judges in fitness hearings are systematically biased in favor of the agency." (Am. Compl. ¶ 137.) They assert that TLC judges are not independent because they are hired by the TLC on a per diem basis and may be fired without cause, with no contractual, civil service or statutory job protections. (*Id.* ¶ 75.) The underlying premise is valid: Plaintiffs have a right to an impartial ALJ in their fitness hearings. A biased decisionmaker violates the basic due process requirement of a "fair trial in a fair tribunal." *Withrow v. Larkin*, 421 U.S. 35, 46-47 (1975) (citations omitted). The Plaintiffs, however, are incorrect in their conclusion that the ALJs are inherently biased by their position in the TLC structure. Plaintiffs' contention of bias must overcome the presumption of honesty and integrity accorded to adjudicators. *Id.* at 47. "[City] administrators are assumed to be [people] of conscience and intellectual discipline capable of judging fairly." *Id.* at 55. Other than broad allegations of systematic bias, Plaintiffs present no evidence of actual bias.

A due process violation may be established without showing actual bias where " 'a court determin[es] from the special facts and circumstances present in the *case before it* that the risk of unfairness is intolerably high.' " *Greenberg v. Bd. of Governors of the Fed. Reserve Sys.*, 968 F.2d 164, 167 (2d Cir. 1992) (alterations in original) (emphasis added) (*quoting Withrow*, 421 U.S. at 58). Various situations, such as a judge's pecuniary interest in the outcome, lend themselves to the probability of bias. *Withrow*, 421 U.S. at 47. In order to succeed on a pecuniary interest claim, a plaintiff should present allegations against a specific adjudicator. *See Tumey v. State of Ohio*, 273 U.S. 510, 523 (1927) (overturning a conviction because a small part of the judge's income consisted of court fees collected from convicted defendants); *see also Ward v. Vill. of Monroeville, Ohio*, 409 U.S. 57, 58-59 (1972) (holding that trial before a mayor, who was responsible for the village finances and whose court provided a substantial portion of the village funds, denied plaintiff a trial before a disinterested and impartial officer).

While Plaintiffs assert that ALJs have a pecuniary interest in the outcome of their cases, they neither name one ALJ in their Amended Complaint nor allege any specific improper conduct. Even in *Padberg*, a case where taxicab drivers asserted that the TLC ALJs who conducted *their* suspension and revocation hearings were biased, plaintiffs named the ALJs. *See, e.g., Padberg*, 203 F. Supp. 2d. at 272-73, 287 (naming ALJs McFaul, Schwartz, and Elliott). Moreover, after granting the plaintiffs' summary judgment motion finding that the TLC's summary suspension of drivers who allegedly refused service violated their procedural due process rights (*id.* at 281-82), the court then denied defendants' summary judgment motion on the bias issue, leaving it as the sole remaining issue in the case. *Id.* at 290. The court found that a memo from the Chief ALJ to TLC ALJs provided sufficient, though "not overwhelming," evidence to raise a question of fact as to whether the ALJs were prejudging the facts in service

refusal cases and revoking licenses pursuant to TLC policy. (*Id.* at 288-89.) While Plaintiffs in the instant case assert that the court in *Padberg* ruled in plaintiffs' favor on the bias issue, (Pls.' Sur-Reply Mem. on Collateral Estoppel, 1) in fact, the parties subsequently settled and no judgment was entered on the merits of the bias claim. (Stipulation of Settlement, Docket No. 311, July 20, 2006, Ex. P43.) Plaintiffs cannot assert a sufficiently specific bias claim without naming the ALJs or presenting some specific evidence in support. Plaintiffs' attempt to fill this gap by submitting emails between ALJ Eric Gottlieb and his supervisor Deputy Chief ALJ Coyne (Am. Compl. ¶ 85) in which Gottlieb requested guidance about his proposed recommendation against revocation of Devon Elliot's license despite a positive drug test. Coyne questioned whether Gottlieb was ignoring the test results by focusing on Elliot's excuse that he was unknowingly drugged. (Pls.' Mot. for Partial Summ. J, Ackman Decl. Exs. 4,5.) Gottlieb eventually issued a recommendation for revocation. (*Id.*) Plaintiffs apparently believe that this exchange shows the undue influences the TLC has over ALJs. This example, however, does not support the broad contention urged by Plaintiffs in this case because Gottlieb did not serve as an ALJ for the named Plaintiffs, Elliot is not one of the named Plaintiffs, and even Gottlieb conceded that his recommendation was "unorthodox."

Plaintiffs also assert that, as a matter of policy and practice, license revocation is automatic and the hearing is pre-ordained. (Am. Compl. ¶¶ 47, 49, 68.) They allege that in drug test and conviction revocation cases, TLC judges rule in favor of the agency every time. (*Id.* ¶ 84.) While ALJ recommendations against the TLC appear to be rare (*see, e.g.*, Ackman Decl. Hardekopf Dep. 26-7, 37, 100-07; Daus Dep. 8), an ALJ's record of ruling in favor of the agency does not demonstrate a "closed mind" so as to establish illegal bias. *Pharon v. Bd. of Governors of Fed. Reserve Sys.*, 135 F.3d 148, 155 (D.C. Cir. 1998), cert. denied, 525 U.S. 947 (1998).

Plaintiffs also assert that ALJs are told that there are no defenses to a positive drug test, (*Id.* ¶ 82), and that they should assume that any driver convicted of a crime shall have his license revoked, though there is no published law or rule indicating that penalty. (*Id.* ¶ 90.) The first claim is directly refuted by the fact that there is a medical documentation defense to a positive drug test. The second claim is a conclusory allegation without sufficient factual support in the record. First, often there is little factual dispute about the final disposition of a person's criminal case. Second, Plaintiffs have failed to demonstrate that ALJs are prejudging the facts of a licensee's defense in a revocation hearing.

The risk of bias in this case is not intolerably high and does not raise a sufficiently great possibility that the ALJs have a pecuniary interest in the outcome of the case strong enough to render them biased. Also, Plaintiffs' evidence suggesting improper communications between ALJs and TLC commissioners, an automatic revocation policy, and the absences of specific allegations against the ALJs who presided in Plaintiffs' hearings do not raise an issue of material fact that overcomes the presumption of honesty and integrity given to the ALJs. The record shows TLC's testing scheme and fitness hearings to be commonplace and necessary for administrative practice. *Nash v. Bowen*, 869 F.2d 675, 680-681 (2d Cir. 1989) ("[p]olicies designed to insure a reasonable degree of uniformity among ALJ decisions are not only within the bounds of legitimate agency supervision but are to be encouraged . . .") (citations omitted). In addition, Plaintiffs had recourse to an Article 78 proceeding, which is sufficient for claims that the agency adjudicator was biased and prejudged the outcome or that *ex parte* communications with other officials may have infected the adjudicator's ruling. *Nnebe*, 665 F. Supp. 2d at 330; *Locurto v. Safir*, 264 F.3d 2154, 174 (2d Cir. 2001).

Notwithstanding Dyce's statutory claim, the TLC's statutory notice and practice of notice of hearings provided the other Plaintiffs with adequate protection against erroneous deprivation of their taxicab drivers' licenses. The hearings provided all Plaintiffs with a meaningful opportunity to submit evidence that might help mitigate the severity of their actions. Plaintiffs' bias claim fails because they have not shown that partial ALJs preside over the hearings. For these reasons, Plaintiffs have failed to show a risk of erroneous deprivation of their licenses through the TLC procedures used, and the value of their proposed procedural safeguards.

### c. The TLC Has a Strong Interest in Preventing Conditions That Pose a Danger to the Public Welfare

"[T]he business of transporting passengers for hire by motor vehicle in the [C]ity of New York is affected with a public interest, [and] is a vital and integral part of the transportation system of the [C]ity, and must therefore be supervised, regulated and controlled by the [C]ity." N.Y. Code § 19-501. The regulation of transportation and the preventing of conditions dangerous to the public welfare are legitimate governmental purposes. *Ricketts v. City of N.Y.*, 722 N.Y.S.2d 25 (App. Div. 2001). Among the most critical functions performed by the TLC are ensuring the safety of the taxi-riding public and maintaining the public's trust in the safety of taxis. *Nnebe*, F. Supp. 2d at 324-25 (*citing Buliga v. N.Y. City TLC*, No. 07 Civ. 6507 (DLC), 2007 WL 4547738, at *4 (S.D.N.Y. Dec. 21, 2007). The TLC has a strong interest in ensuring both that passengers are not placed in a vulnerable position with possibly dangerous drivers and in ensuring that the public perceive the taxi industry to be safe. *Id.* at 325. A taxi license represents the TLC's judgment that the licensee is qualified to drive a taxi and interact with passengers. *Id.* at 329. Every license issued by the TLC necessarily implicates the TLC's interest as a licensor. *Id.*

24

The TLC has a strong interest in preventing conditions dangerous to the public welfare that outweighs Plaintiffs' strong interest in their licenses. Given the fact that the notices and hearings provided to Plaintiffs protected them against a high risk of erroneous deprivation, the TLC provided them with sufficient pre-deprivation due process. While there exists a factual dispute about Dyce's statutory notice claim, his due process rights were not violated because he, and the other Plaintiffs, had an opportunity to avail himself of post-deprivation due process through an Article 78 proceeding.

### 4. Article 78 Provides Plaintiffs with Sufficient Post-Deprivation Due Process

"[A]lthough notice and a pre[-]deprivation hearing are generally required, in certain circumstances, the lack of such pre[-]deprivation process will not offend the constitutional guarantee of due process, provided there is sufficient post[-]deprivation process." *Spinelli*, 579 F.3d at 170 (*citing Catanzaro v. Weiden*, 188 F.3d 56, 61 (2d Cir. 1999)). *Sindone v. Kelley*, 2007 U.S. App. LEXIS 26463, *2 (2d Cir. 2007) (challenge to departmental disciplinary proceedings as being infected by bias failed due to availability of subsequent Article 78 review); *Campo v. N.Y. City Employees' Ret. Sys.*, 843 F.2d 96, 100-03 (2d Cir. 1988) (dismissing procedural due process claim based on the availability of Article 78 review of administrative determination). " 'An Article 78 proceeding [] constitutes a wholly adequate post-deprivation hearing for due process purposes.' " *Nnebe*, 665 F. Supp. 2d at 330 (*quoting Locurto*, 264 F.3d at 174)); *see also Fleming v. Kerlikowske*, 1999 U.S. Dist. Lexis 7226, *17 (W.D.N.Y. 1999).

Even if adequate pre-deprivation due process was not found for Plaintiffs, their motion should still be denied because a due process claim for the deprivation of a property interest is not cognizable in a federal district court if state courts provide a remedy for the deprivation of that property interest. *Gabris*, 2005 U.S. Dist. Lexis 23391, at *8 (*citing Hudson v. Palmer*, 468 U.S.

517, 533 (1984); *Marino v. Ameruso*, 837 F.2d 25, 47 (2d Cir. 1988)). New York state courts provide for such a remedy through Article 78 proceedings. N.Y. CPLR. §§ 7801, 7803 (McKinney 2008). An Article 78 proceeding "provides the mechanism for challenging a specific decision of a state [or municipal] administrative agency." *Gabris*, 2005 U.S. Dist. Lexis 23391, at *8-9 (*quoting Campo*, 843 F.2d at 101) (alteration in original). The proceeding "permits a petitioner to submit affidavits and other written evidence; and where a material issue of fact is raised, have a trial of the disputed issue, including constitutional claims." *Id.* at *8 (*quoting Locurto*, 264 F.3d at 174). The proper form and forum for the relief sought by the Plaintiffs is an Article 78 proceeding in the Supreme Court. N.Y. CPLR § 7801(1); *Fuca v. City of N.Y.*, 836 N.Y.S.2d 757 (App. Term 2007).

A plaintiff's failure to commence an Article 78 proceeding within the four-month limitations period does not prevent this Court from taking into account the availability of such proceedings when determining whether he has been afforded due process. *Fleming*, 1999 U.S. Dist. Lexis 7226, *16-17 (*citing Giglio v. Dunn*, 732 F.2d 1133, 1135 (2d Cir. 1984). Plaintiffs failed to take advantage of the post-revocation process in connection with their license revocations. For these reasons, there is no genuine issue of material fact as to the adequacy of the process provided Plaintiffs.

### 5. TLC's Drug Testing Policy Does Not Violate the Fourth Amendment

Plaintiffs vague assertion of a violation of the Fourth Amendment in Counts 1 through 3 of their Amended Complaint is clarified in Count 7, a state claim, which states that the TLC administers drug tests in the "absence of probable cause or reasonable suspicion" in violation of the New York State Constitution, Article 1, § 6. (Am. Compl. ¶¶ 161-63.) "The collection and analysis of a urine specimen is a Fourth Amendment search and is therefore subject to a

reasonable inquiry." *Griffin v. Long Island Railroad*, 96 Civ.4673 (ARR), 1998 U.S. Dist. Lexis 19336, at \*20 (*citing Chandler v. Miller*, 520 U.S. 305 (1997); *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602 (1989)). The reasonableness standard requires an administrator of drug tests to balance the privacy intrusion against the promotion of legitimate governmental interests. *Skinner*, 489 U.S. at 619. "[R]andom testing of safety-sensitive employees has been approved, even in the absence of a safety-triggering event," *Griffin*, 1998 U.S. Dist. Lexis 19336, at \*20. (*citing Ry. Labor Executives' Ass'n v. Skinner*, 934 F.2d 1096 (9th Cir. 1991)), or individual suspicion, *Skinner*, 489 U.S. at 624 (rail employees involved in train accidents or who committed safety violations). *See also Int'l Bhd. of Teamsters v. Dept. of Transp.*, 932 F.2d 1292, 1304 (9th Cir.1991) (upholding random drug testing of commercial truck drivers); *Int'l Bhd. of Elec. Workers, Local 1245 v. Skinner*, 913 F.2d 1454, 1458 (9th Cir.1990) (upholding random testing of all employees engaged in operations on gas pipelines); *Bluestein v. Skinner*, 908 F.2d 451, 457 (9th Cir.1990) (upholding random drug testing of flight instructors and dispatchers). The TLC has a compelling interest in administering drug tests, and Plaintiffs had a minimal expectation of privacy in light of their safety-sensitive position as drivers. For these reasons, the TLC drug testing policy does not violate Plaintiffs' Fourth Amendment protection against unreasonable search and seizure.

**C.    Plaintiffs' State Claims Should be Dismissed**

Plaintiffs bring state law claims in Counts 4 through 12 of their Amended Complaint, pursuant to this Court's supplemental jurisdiction as articulated in 28 U.S.C. § 1367. (Am. Compl. ¶ 7.) These claims should be dismissed along with the federal claims. A district court may decline to exercise supplemental jurisdiction over state law claims when it "has dismissed all claims over which it has original jurisdiction[.]" 28 U.S.C. § 1367(c)(3). "It is well

established that when federal claims are dismissed before trial, the state claims should be

dismissed as well." *Avello v. Hammons*, 963 F.Supp. 262, 270 (S.D.N.Y. 1997) (*citing United

Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)); *Castellano v. Bd. of Trustees of the Police

Officers' Variable Supplements Fund*, 937 F.2d 752, 758 (2d Cir. 1991). The factors of judicial

economy, convenience, fairness, and comity weigh heavily in favor of declining to exercise

jurisdiction over remaining state-law claims. *Castellano*, 937 F.2d at 758.

Furthermore, exercising supplemental jurisdiction over Plaintiffs' claims based on the

New York Constitution "would violate fundamental principles of federalism and comity"

because "New York State has a definite interest in determining whether its own laws comport

with the New York Constitution." *Schulz v. The N.Y. State Executive*, 960 F. Supp. 568, 580-81

(N.D.N.Y. 1997) (*citing Young v. N.Y. City Transit Auth.*, 903 F.2d 146, 163-64 (2d Cir. 1990)).

While the sum and substance of Plaintiffs' state claims are the same as their federal claims, these

claims allege violations of the New York Constitution, (Am. Compl. ¶¶ 6, 161-62, 168-69), and

various New York statutes. Therefore, this Court should not exercise supplemental jurisdiction

over Plaintiffs' state claims, and those claims should be dismissed.

**D.      Claims Against TLC and Individual Defendants Should be Dismissed**

**1.   Claims Against Defendant TLC Should be Dismissed**

Plaintiffs' claims against Defendant TLC, an agency of the City of New York, should be

dismissed because "a New York City agency cannot be sued in its own capacity." *Nnebe*, 665 F.

Supp. 2d at 320 (*citing Gabris*, 2005 U.S. Dist. Lexis 23391, at *7 n.4). "All actions and

proceedings for the recovery of penalties for the violation of any law shall be brought in the

name of the [C]ity of New York and not in that of any agency, except where otherwise provided

by law." N.Y. Charter, ch. 17, § 396 (2009); *Davis v. City of N.Y.*, No. 00 Civ. 4309 (SAS), 2000

WL 1877045, n.1 (S.D.N.Y. Dec. 27, 2000) (concluding that the New York Police Department is an agency of the City of New York and therefore a not subject to sueable entity); *Siino v. Dep't of Educ. of the City of N.Y.*, 843 N.Y.S.2d 828, 829 (App. Div. 2007) (finding that the Department of Investigation is not a proper party to litigation).

### 2.  Claims Against Daus, McGrath-Mckechnie, Eckstein, Bonina, and Coyne, in their Individual and Official Capacities, Should be Dismissed

Plaintiffs allege that Defendants have "willfully, knowingly, and with [] specific intent," conspired to "deprive plaintiffs of their constitutional rights . . . ." (Am. Compl. ¶¶ 139, 143.) Defendants cannot be liable in their individual capacities because they are protected by qualified immunity. Qualified immunity shields government officials who perform discretionary-as distinct from ministerial-functions from liability for damages arising from their actions which do " 'not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Kaminsky v. Rosenblum*, 929 F.2d 922, 925 (2d Cir. 1991) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The immunity question turns on whether it was objectively reasonable for officials to believe that their decisions did not violate plaintiffs' clearly established constitutional rights. *McEvoy v. Spencer*, 124 F.3d 92, 96 (2d Cir. 1997). Resolution of this question entails inquiry into the nature and extent of rights asserted, and whether plaintiffs' entitlement is well-settled. *Id.* (*citing Kaluczky v. City of White Plains*, 57 F.3d 202, 206 (2d Cir. 1995). As mentioned above, Plaintiffs have a claim of entitlement in their licenses. However, ALJs, TLC chairperson, and the deputy commissioner all have discretionary functions within the TLC. As a result, qualified immunity, which exists to protect officials and encourage the vigorous exercise of official authority, should apply to them. *See Walz*, 46 F.3d at 169 (*citing Harlow*, 457 U.S. at 807).

A suit brought against a public officer in his official capacity is treated as a suit against the government. *P.C. v. McLaughlin*, 913 F.2d 1033, 1039 (2d Cir. 1990) (*citing Kentucky v. Graham*, 473 U.S. 159, 165-68 (1985). Official capacity generally represents only another way of pleading an action against an entity of which an officer is an agent. *Kentucky*, 473 U.S. at 165. In an official capacity suit the entity's "policy or custom" must have played a part in the violation of federal law. *Id.* at 166. Plaintiffs have failed to allege facts sufficient to demonstrate that an officially adopted policy or custom of the City of New York (the proper municipal defendant in this case) caused a violation of Plaintiffs' federally protected rights. *Dwares v. City of N.Y.*, 985 F.2d 94, 100 (2d Cir. 1993) (stating that a mere assertion of a custom or policy is not sufficient to sustain a § 1983 claim against a municipal defendant in the absence of any allegations of fact). Therefore, Plaintiffs' official capacity claims should be dismissed.

## IV. CONCLUSION

For the foregoing reasons, I recommend that Defendants' Motion for Summary Judgment (Doc. No. 76) be **GRANTED** and Plaintiffs' Motions for Summary Judgment (Doc. Nos. 48 & 78) be **DENIED** and that the Complaint be **DISMISSED** in its entirety.

Pursuant to Rule 72, Federal Rules of Civil Procedure, the parties shall have fourteen (14) days after being served with a copy of the recommended disposition to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies delivered to the chambers of the Honorable Sidney H. Stein, 500 Pearl Street, Room 1010, and to the chambers of the undersigned, 500 Pearl Street, Room 1970. Failure to file timely objections shall constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. *See Thomas v. Arn*,

474 U.S. 140, 150 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (*per curiam*); 28 U.S.C. § 636(b)(1) (West Supp. 1995); FED. R. CIV. P. 72, 6(a), 6(d).

**Dated: September 8, 2010**
**New York, New York**

**Respectfully Submitted,**

**The Honorable Ronald L. Ellis**
**United States Magistrate Judge**

**Copies of this Report and Recommendation were sent to:**

Counsel for Plaintiffs
Daniel L. Ackman
12 Desbrosses Street
New York, New York 10013

Counsel for Defendants
Amy J. Weinblatt
New York City Law Department, Office of the Corporation Counsel (NYC)
100 Church Street
New York, New York 10007