USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _7/31/2014_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------

SAUL ROTHENBERG, EBRAHIM ABOOD,
TOBBY KOMBO, KONSTANTINOS
KATSIGIANNIS, BOUBACAR DOUMBIA,
ROBERT DYCE, and MOUSTACH ALI,
individually and on behalf of all others
similarly situated,

                  Plaintiffs,

     -against-

MATTHEW DAUS, DIANE MCGRATH-
MCKECHNIE, JOSEPH ECKSTEIN,
ELIZABETH BONINA, THOMAS COYNE,
THE NEW YORK CITY TAXI AND
LIMOUSINE COMMISSION and THE
CITY OF NEW YORK,

                  Defendants.

------------------------------

08-Cv-567 (SHS)

OPINION & ORDER

TABLE OF CONTENTS

I.     Background ........................................................................4

    A.  The TLC issues and revokes licenses for taxicab and FHV
       drivers pursuant to New York City law. .................................4

    B.  The TLC suspended and then revoked plaintiffs' licenses to
       drive taxicabs and FHVs. ............................................................6

    C.  Procedural History ...................................................................8

II.   Legal Standard ................................................................10

III.   Discussion ................................................................................................10

   A.  Plaintiffs have a protected property interest in their licenses. ...........11

   B.  All plaintiffs except Ali had fair warning that their conduct
       would result in revocation of their licenses. ...........................................13

       1.  Of the conviction defendants, Kombo and Dyce—but not
           Ali—had fair warning that their convictions would lead
           to revocation. ..............................................................................14

       2.  Drug test plaintiffs had fair warning that a failed drug
           test would prompt revocation. ....................................................21

   C.  Conviction plaintiffs had adequate notice of their hearings but
       drug test plaintiffs lacked adequate notice. ..........................................30

       1.  Hearing notices to conviction plaintiffs were adequate,
           because further specification of the alleged misconduct
           would have provided no further due process. .........................30

       2.  Hearing notices to drug test plaintiffs were inadequate
           because they provided plaintiffs with no information
           about what drug was present. .....................................................33

   D.  Plaintiffs' right to a meaningful hearing was adequately
       protected by the combination of their post-deprivation hearings
       and their right to Article 78 review .........................................................36

       1.  Plaintiffs were not entitled to pre-deprivation hearings. .........36

       2.  Plaintiffs' TLC adjudications—except for Ali's—
           represented adequate post-deprivation hearings. ...................37

   E.  A genuine dispute remains as to the impartiality of the ALJs. ...........43

   F.  This Court will not exercise jurisdiction over plaintiffs' state law
       claims, which could have been asserted in Article 78
       proceedings. ..............................................................................................46

IV.   Conclusion ................................................................................................49

SIDNEY H. STEIN, U.S. District Judge.

Plaintiffs—former drivers of taxicabs and for-hire vehicles ("FHVs")—have sued the City of New York and several officials for alleged violations of their Fourteenth Amendment right to due process, based on the revocation of their licenses by the New York City Taxi and Limousine Commission ("TLC"). Plaintiffs Ebrahim Abood, Boubacar Doumbia, Konstantinos Katsigiannis, and Saul Rothenberg ("drug test plaintiffs") failed a required annual drug test, prompting the suspensions and revocations of their licenses. Plaintiffs Robert Dyce, Tobby Kombo, and Moustach Ali ("conviction plaintiffs") were arrested and then convicted for off-duty conduct, leading to their suspensions and revocations. Plaintiffs allege that defendants Matthew Daus, Diane McKechnie, Joseph Eckstein, Elizabeth Bonina, Thomas Coyne, and the City of New York violated the Fourteenth Amendment's guarantee of procedural due process in four principal ways: (1) the regulations putatively supporting plaintiffs' revocations were unconstitutionally vague; (2) the notices of their revocation hearings were constitutionally inadequate; (3) the revocation hearings were sham hearings that did not provide plaintiffs a meaningful opportunity to be heard; and (4) the administrative law judges ("ALJs") conducting the hearings were impermissibly biased against plaintiffs. Plaintiffs also complain that their license revocations violated several state laws.

Before the Court are the parties' cross-motions for summary judgment, on remand after the U.S. Court of Appeals for the Second Circuit affirmed in part and vacated in part an earlier grant by this Court of summary judgment for defendants. For the reasons set forth below, the Court grants partial summary judgment to defendants, grants partial summary judgment to plaintiffs, and concludes that a genuine issue of material fact persists as to whether plaintiffs had the benefit of an impartial tribunal. The Court also concludes that it does not have jurisdiction to consider plaintiffs' state law claims or alternatively declines

to exercise jurisdiction over those claims and therefore dismisses plaintiffs'
state law claims.

## I.   BACKGROUND

### A.   The TLC issues and revokes licenses for taxicab and FHV drivers pursuant to New York City law.

The New York City Charter establishes the TLC, "the purposes of
which shall be the continuance, further development and improvement of
taxi and limousine service in the city of New York." N.Y.C. Charter § 2300.
The TLC comprises nine commissioners, including a chairman, appointed
by the Mayor of New York City. *Id.* § 2301(a), (c). Its charge includes the
promulgation of standards for safety and licensing related to taxis and
limousines. *Id.* § 2300. The City Charter vests specific powers in the TLC,
including "[t]he issuance, revocation, [and] suspension of licenses for
drivers, chauffeurs, owners or operators of vehicles, other than licenses
issued pursuant to state law, . . . and the establishment of qualifying
standards required for such licenses." *Id.* § 2303(b)(5). That section further
provides to the TLC residual authority to "formulat[e], promulgat[e] and
effectuat[e] [] rules and regulations reasonably designed to carry out the
purposes, terms and provisions of this chapter." *Id.* § 2303(b)(11).

Any driver of a taxicab or FHV in New York City must obtain a license
from the TLC. *See* N.Y.C. Admin. Code § 19–505(a) (2009). Where the
Charter creates the general power to license drivers and set standards for
licensure, the New York City Administrative Code provides further
instruction on those standards. For example, it requires that license
applicants "[b]e fingerprinted," *id.* § 19–505(b)(4), "[b]e of good moral
character," *id.* § 19–505(b)(5), and "[n]ot be addicted to the use of drugs or
intoxicating liquors," *id.* § 19–505(b)(6).

Relying on the authority granted to it by the City Charter and on the
more specific instructions in the Administrative Code, the TLC has
promulgated licensing requirements for drivers of taxicabs. The

requirements for drivers of taxicabs are codified in Chapter 2 of the TLC Rules, and the requirements for FHV drivers are codified in Chapter 6.[1]

Some of the requirements incumbent on TLC-licensed drivers are specific. For example, a driver is prohibited from "threaten[ing], harass[ing] or abus[ing] any passenger" while on-duty, TLC Rules § 2–60(a); "distract[ing] or attempt[ing] to distract a service animal accompanying a person with a disability," *id.*; committing or attempting "fraud, misrepresentation or larceny against a passenger" while on-duty, *id.* § 2–61(a)(1); and "offer[ing] or giv[ing] any gift, gratuity or thing of value to any employee, representative or member of the [TLC]," *id.* § 2–62(a). Other requirements are more general. For example, a driver must not "commit or attempt . . . any willful act of omission or commission which is against the best interests of the public." *Id.* § 2–61(a)(2).

One section of the TLC Rules pertains specifically to criminal convictions, requiring drivers to "notify the [TLC] in writing of his conviction of a crime within fifteen (15) days of such conviction" and to "deliver to the [TLC] a certified copy of the certificate of disposition issued by the Clerk of Court within fifteen (15) days of sentencing." *Id.* § 2–63. Separately, in the section of the Rules dealing only with probationary licenses, the Rules allow for revocation of a probationary license if a driver is convicted of a crime during the probationary period. *Id.* § 2–04(b).

Pursuant to the City Charter's delegation to the TLC of "[t]he issuance, revocation, [and] suspension of licenses for drivers," N.Y.C. Charter § 2303(b)(5), the TLC has adopted rules to define what conduct prompts fitness hearings, suspensions, and revocations, *see, e.g.*, TLC Rules §§ 8–14

---

[1] During the litigation of this action, the TLC revised and renumbered the TLC Rules. *See* 35 R.C.N.Y. 70–01 ("Transition Rules"). This Opinion cites the earlier version of the TLC Rules, because that version was in effect at the time of plaintiffs' revocation proceedings and when the complaint in this action was filed. *See Rothenberg v. Daus*, 481 F. App'x 667, 671 n.2 (2d Cir. 2012).

to 8–17. Section 8–15(c) of the TLC Rules allows the TLC to suspend a driver's license if a driver fails a required drug test. More generally, Section 8–15(a) allows the TLC to initiate revocation proceedings if the driver "does not meet or does not continue to meet the qualifications for licensure."

At all times relevant to this action, revocation proceedings took place under the administrative auspices of the TLC, and all fitness hearings took place before the TLC's own administrative law judges ("ALJs"). (Defs.' Rule 56.1 Statement of Material Undisputed Facts ("Defs.' 56.1") ¶ 28; Pls.' Post-Remand Rule 56.1 Statement in Support of Their Renewed Mot. for Summary Judgment ("Pls.' 56.1") ¶ 31.) After the facts underlying this action took place, the TLC substantially amended its adjudication rules and transferred its adjudication process to New York City's Office of Administrative Trials and Hearings ("OATH"). (*Id.* ¶ 31; Defs.' 56.1 ¶¶ 35, 51.)

### B.   The TLC suspended and then revoked plaintiffs' licenses to drive taxicabs and FHVs.

Against this regulatory backdrop, plaintiffs obtained taxicab and FHV driver's licenses from the TLC. The following facts are undisputed.

Tobby Kombo was a TLC-licensed taxicab driver when he was arrested on July 16, 2006. (Defs.' 56.1 ¶ 183.) Two days later, on July 18, 2006, the TLC suspended Kombo's license. (*Id.* ¶ 184.) Kombo pled guilty to assault in the second degree on March 29, 2007. (*Id.* ¶ 185.) On April 23, 2007, Kombo notified the TLC that he had been convicted, and in a notice dated April 24 he was directed to appear for a fitness hearing to determine whether the TLC would revoke his license. (*Id.* ¶¶ 185-186.) Kombo appeared for his fitness hearing on May 4, 2007, before a TLC administrative law judge. (*Id.* ¶ 188.) The ALJ recommended to then-TLC Chairman Matthew Daus that the TLC revoke Kombo's license, and

Kombo sent a responsive memorandum to Daus. (*Id.* ¶¶ 193, 195). Seven weeks later, on June 20, 2007, Daus revoked Kombo's license. (*Id.* ¶ 196.)

Robert Dyce had held a TLC license to drive a taxicab for approximately five years when he was arrested for possession of a forged instrument in the third degree on April 11, 2006. (*Id.* ¶¶ 199-200.) On the same day, Dyce pled guilty to that charge. (*Id.* ¶ 202.) The TLC suspended his license three days later. (*Id.* ¶ 201.) On April 19, the TLC notified Dyce of his fitness hearing, to be held on May 16, 2006. (*Id.* ¶¶ 203-204.) A TLC ALJ conducted the fitness hearing and recommended that Daus revoke Dyce's license. (*Id.* ¶ 208.) Dyce responded in writing to Daus. (*Id.* ¶ 210.) On June 22, 2006, Daus revoked Dyce's license. (*Id.* ¶ 211.)

Moustach Ali was a TLC-licensed FHV driver for a decade until July 25, 2006, when he was arrested for driving while intoxicated. (*Id.* ¶¶ 214-215; *see* Defs.' Mem. at 7.) On August 8 of that year, Ali resolved his criminal case by pleading guilty to the non-criminal infraction in the New York Vehicle and Traffic Law of driving while ability impaired ("DWAI"). (Defs.' 56.1 ¶ 217.) The next day, the TLC notified Ali that his license was suspended. (*Id.* ¶ 216.) After receiving notice that a hearing was scheduled, Ali appeared for his hearing on August 22, 2006, before a TLC ALJ. (*Id.* ¶ 218-219.) The ALJ recommended that Ali's license be revoked, and his attorney sent a response to the TLC. (*Id.* ¶¶ 228-229.) On September 28, 2006, Daus revoked Ali's license. (*Id.* ¶ 230.)

Saul Rothenberg, Konstantinos Katsigiannis, and Boubacar Doumbia were all TLC-licensed taxicab drivers whose licenses were revoked after they tested positive for illicit drugs in their annual drug tests. (*Id.* ¶¶ 112-114, 150-152, 164-166.) Ebrahim Abood, also a TLC-licensed taxicab driver until failing an annual drug test, failed his drug test because he submitted two urine samples at below 90° Farenheit, leading the drug testing laboratory to conclude pursuant to its testing protocol that he had adulterated or substituted his samples. (*Id.* ¶¶ 134-136, 143.) Rothenberg, Katsigiannis, Doumbia, and Abood all received notice of revocation

hearings, appeared at hearings before TLC ALJs, and had their licenses ultimately revoked, although none of them was accused of addiction to drugs or of on-duty impairment. (*Id.* ¶¶ 128-131, 144-147, 158-161, 177-180; Pls.' 56.1 ¶¶ 146-160.)

### C.  Procedural History

Plaintiffs allege in this action brought under 42 U.S.C. § 1983 a variety of due process violations pursuant to the Fourteenth Amendment of the U.S. Constitution. Specifically, plaintiffs contend that the suspension and later revocation of their licenses violated their due process rights because: (1) they lacked fair warning that their conduct would require revocation; (2) they lacked adequate notice with respect to their individual hearings; (3) their hearings did not provide a meaningful opportunity to be heard; and (4) their hearings were subject to adjudication by biased administrative law judges ("ALJs"). In addition, plaintiffs initially challenged defendants' mandatory drug testing—*i.e.*, in the "absence of probable cause or reasonable suspicion"—as a violation of the Fourth and Fourteenth Amendments of the U.S. Constitution. (Am. Compl. ¶¶ 161-163.) Finally, several claims are based on analogous state and local laws: namely, that defendants' policies exceeded the scope of their delegated powers, violating the New York City Charter and Administrative Code (*id.* ¶¶ 148-159); that revoking plaintiffs' licenses as a response to a criminal conviction violated the New York Corrections Law (*id.* ¶¶ 164-166); that defendants violated plaintiffs' due process rights guaranteed to them by the New York State Constitution (*id.* ¶¶ 167-170); that defendants' procedures for adopting TLC regulations violated the City Administrative Procedure Act ("CAPA") and the New York City Charter (*id.* ¶¶ 171-173); that the TLC's ex parte communication with its ALJs violated the CAPA (*id.* ¶¶ 174-176); and that plaintiffs' allegedly sham hearings violated the CAPA (*id.* ¶¶ 177-179).

The parties cross-moved for summary judgment. On September 8, 2010, Magistrate Judge Ronald L. Ellis issued a Report and

Recommendation recommending that defendants' motion for summary judgment be granted and that plaintiffs' motions for partial summary judgment be denied. *See Rothenberg v. Daus*, No. 08 Civ. 567, 2010 WL 3860425 (S.D.N.Y. Sept. 8, 2010) ("*Rothenberg I*"). This Court subsequently adopted the Report and Recommendation with certain modifications. *See Rothenberg v. Daus*, No. 08 Civ. 567, 2010 WL 3860417 (S.D.N.Y. Sept. 30, 2010) ("*Rothenberg II*").

On appeal, the U.S. Court of Appeals for the Second Circuit "affirm[ed] the decision of [this Court] dismissing TLC as a defendant, and [] deem[ed] plaintiffs' Fourth Amendment claim forfeited on appeal." *Rothenberg v. Daus*, 481 F. App'x 667, 670 (2d Cir. 2012) ("*Rothenberg III*"). At the same time, the Second Circuit vacated and remanded the action for a determination by this Court on the issues of "plaintiffs' federal due process claims, plaintiffs' state claims, and plaintiffs' claims against the individual defendants." *Id.*[2]

---

[2] According to plaintiffs, the Second Circuit's "ruling necessarily determine[d] facts and law," requiring this Court to hold "at a minimum, that plaintiffs have shown that the evidence is such that a reasonable jury could return a verdict for them." (Pls.' Reply Mem. of Law in Opp. to Defs.' Mot. & in Support of Their Renewed Mot. for Summary Judgment ("Pls.' Reply") at 1; *see also* Pls.' Mem. of Law in Opp. to Defs.' Mot. & in Support of Their Renewed Mot. for Summary Judgment ("Pls.' Opp.") at 3-5.)

Plaintiffs are wrong. The Court of Appeals in *Rothenberg III* did not determine any facts in this case, but rather it "identif[ied] a number of issues that warrant further briefing and, possibly, record development." 281 F. App'x at 671. Although the vacatur and remand oblige this Court to consider the issues identified by the Second Circuit, they do not pre-ordain plaintiffs' success on those issues and they do not foreclose defendants from having renewed their motion for summary judgment.

Following remand to this Court, the parties have renewed their respective motions for summary judgment, accompanied by further briefing and extensive record development.

## II.  LEGAL STANDARD

Summary judgment is appropriate only if the evidence shows that there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In determining whether a genuine dispute of material fact exists, the Court "is to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004). Nonetheless, the party opposing summary judgment "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence" in support of its factual assertions. *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998); *see also Buckley v. Deloitte & Touche USA LLP*, 888 F. Supp. 2d 404, 414-15 (S.D.N.Y. 2012), *aff'd* 541 F. App'x 62 (2d Cir. 2013).

"When considering cross-motions for summary judgment, a court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Make the Rd. by Walking, Inc. v. Turner*, 378 F.3d 133, 142 (2d Cir. 2004) (internal quotation marks omitted). Thus, a district court addressing cross-motions for summary judgment "is not required to grant judgment as a matter of law for one side or the other." *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993).

## III.  DISCUSSION

The Fourteenth Amendment to the United States Constitution guarantees that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend XIV, § 1. In considering a Section 1983 challenge based on procedural due process, a

court must address "(1) whether a property interest is implicated, and, if it is, (2) what process is due before the plaintiff may be deprived of that interest." *Nnebe v. Daus*, 644 F.3d 147, 158 (2d Cir. 2011).

In analyzing what process is due, courts balance the three factors set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976). *See id.* at 335. Those three factors are as follows:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* The balancing of these three factors constitutes "the test for both when a hearing is required (*i.e.*, pre- or post-deprivation) and what kind of procedure is due . . . ." *Brody v. Village of Port Chester*, 434 F.3d 121, 134 (2d Cir. 2005). Where a lawsuit alleges multiple due process challenges, courts apply the *Mathews* test separately to each claim. *See, e.g., Rothenberg III*, 481 F. App'x at 674 (considering *Mathews* factors with respect to adequacy of hearing notice letters); *id.* at 675 (considering *Mathews* factors with respect to meaningfulness of hearings).

### A.  Plaintiffs have a protected property interest in their licenses.

The due process guaranteed by the Fourteenth Amendment is explicitly limited to interests in "life, liberty, or property." U.S. Const. amend XIV, § 1. A plaintiff claiming the guarantee of procedural due process must therefore "first identify a property right." *Local 342, Long Island Pub. Svc. Employees v. Town Bd. of Huntington*, 31 F.3d 1191, 1194 (2d Cir. 1994). The holder of a state driver's license or business license has a firmly established property right in that license, because "[o]nce licenses are issued . . . their continued possession may become essential in the pursuit of a livelihood." *Bell v. Burson*, 402 U.S. 535, 539 (1971); *see Spinelli*

*v. City of New York*, 579 F.3d 160, 169 (2d Cir. 2009). The same reasoning applies to taxicab and FHV driver's licenses, each being necessary for the license holder's continued employment.

When the parties in this case originally cross-moved for summary judgment, it was "undisputed that a taxi driver has a protected property interest in his license sufficient to trigger due process protection," *Rothenberg I*, 2010 WL 3860425, at *4 (quoting *Nnebe*, 665 F. Supp. 2d at 323), as it was on appeal, *see* Brief of Defendants-Appellees at 29, 44, *Rothenberg v. Daus*, 481 F. App'x 667 (2d Cir. 2012) (No. 10-4411-CV). Defendants now dispute whether three plaintiffs—Rothenberg, Kombo, and Ali—had any protected property interest in their licenses, because at the time of their revocations, they had license renewal applications pending before the TLC.

Defendants' new argument lies outside the scope of the Second Circuit's remand order, which "identif[ied] a number of issues that warrant further briefing and, possibly, record development" but which did not identify the existence vel non of a protected property interest as one of those issues. *Rothenberg III*, 281 F. App'x at 671. The absence of this issue from the Second Circuit's remand order makes perfect sense, of course, because all the parties to this litigation had previously agreed that all plaintiffs had a property interest in their licenses. Accordingly, litigation of this new issue is foreclosed. *See United States v. Ben Zvi*, 242 F.3d 89, 95-96 (2d Cir. 2001) ("generally prohibit[ing] the district court from reopening the issue on remand unless the mandate can reasonably be understood as permitting it to do so"); *United States v. Stanley*, 54 F.3d 103, 107 (2d Cir. 1995) ("Because [defendant] decided on his first appeal to forego [an] argument . . . , the mandate rule prohibited the district court from reopening the issue."). Even if this rule did not prohibit this Court from considering defendants' new argument, this Court has the discretion to refuse to entertain it at this late stage. *Thomas v. Arn*, 474 U.S. 140, 154 n.14 ("[T]he district court . . . may refuse to entertain issues that are not

raised in properly filed objections" to a magistrate judge's report and recommendation.); *see also United States v. Grandberry*, 730 F.3d 968, 980 n.10 (9th Cir. 2013).

Defendants had several full rounds of briefing in which they might have raised this issue: in briefing the original cross-motions for summary judgment before the magistrate judge; in the objections to the Report and Recommendation of September 8, 2010, which all parties filed; and on appeal before the Second Circuit. They declined to raise the issue at those stages, and the Court declines to entertain the issue now. For purposes of determining whether summary judgment is proper, the Court concludes that plaintiffs' TLC-issued licenses are property interests protected by the Due Process Clause.

### B.   All plaintiffs except Ali had fair warning that their conduct would result in revocation of their licenses.

"[A] law or regulation whose violation could lead to [] a deprivation [of property] must be crafted with sufficient clarity to 'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited' and to 'provide explicit standards for those who apply them.'" *Piscottano v. Murphy*, 511 F.3d 247, 280 (2d Cir. 2007) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)). Because "we can never expect mathematical certainty from our language," *Grayned*, 408 U.S. at 110, a regulation is "not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language," *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32 (1963). To balance the interest in clarity with the challenges of meticulous specificity, the Second Circuit's standard for sufficient clarity requires that "a reasonably prudent person, familiar with the conditions the regulations are meant to address and the objectives the regulations are meant to achieve, has fair warning of what the regulations require." *Rock of Ages Corp. v. Sec'y of Labor*, 170 F.3d 148, 156 (2d Cir. 1999) (*quoted in Rothenberg III*, 481 F. App'x at 671.) The inquiry "begin[s] with the text of

the provision, considered 'in context, and where appropriate, with the benefit of canons of statutory construction and legislative history.'" *Rothenberg III*, 481 F. App'x at 671 (quoting *United States v. Farhane*, 634 F.3d 127, 142 (2d Cir. 2011)).

Plaintiffs contend that they lacked fair notice that their conduct would lead to revocation, pointing to standards that they believe are vague and to practices that they believe are inconsistent with published standards. Because the challenged standards and practices differ as between how defendants treat convictions on one hand and failed drug tests on the other, the Court considers each category of revocations separately.

### 1. Of the conviction plaintiffs, Kombo and Dyce—but not Ali— had fair warning that their convictions would lead to revocation.

Plaintiffs Kombo, Dyce, and Ali were convicted of a variety of off-duty conduct. (*See* Pls.' 56.1 ¶¶ 147-153; Defs.' 56.1 ¶¶ 185, 202, 217.) After each was convicted, the TLC conducted a fitness hearing and subsequently revoked his license for failure to continue to meet the qualifications of a licensed taxicab driver. *See* TLC Rules § 8–15(a). Plaintiffs allege that the TLC used a per se rule of revocation following their convictions and that they lacked fair warning that their conduct would lead to license revocation. Defendants, on the other hand, contend that a reasonable person familiar with the requirement that a taxicab driver have "good moral character," and familiar with that requirement's purposes, would expect plaintiffs' convictions to prompt revocation.

Plaintiffs have identified a per se policy by which the TLC revoked their licenses on the grounds of their convictions alone. For plaintiffs convicted of assault (Kombo) or possession of a forged instrument (Dyce), the good moral character requirement so clearly prohibited their convictions that they should reasonably have expected revocation as a per se response. But plaintiff Ali was found to have committed the non-

criminal infraction of driving while ability impaired under the Vehicle and Traffic Law. His conviction was neither for a crime nor for conduct inconsistent with good moral character and as a result he did not have fair warning that his conviction would result in revocation.

> a.   *Plaintiffs' convictions led to per se determinations of unfitness.*

In the past, the parties have disputed whether the TLC's response to a conviction is per se revocation or a more flexible determination. Plaintiffs have contended that, although no law or regulation calls for per se revocation on the basis of conviction alone, the de facto practice of the TLC is to consider no facts other than the identity of the convict and the nature of the offense when determining whether to revoke a license. Accordingly, the Second Circuit directed this Court to "address the evidence in the record that an unpublished TLC policy imposed revocation as a per se penalty for conviction for certain offenses, including the offenses for which plaintiffs were convicted . . . ." *Rothenberg III*, 481 F. App'x at 673.

The evidence demonstrating per se revocation upon criminal conviction is overwhelming. It is clear that, at the very least, the ALJs making determinations of fitness understood the TLC's practice as automatically revoking licenses for convictions. ALJ Frank Fioramonti testified that he does not consider whether the crime has any nexus to driving a taxi (Fioramonti Dep. 88, Nov. 7, 2008.), whether the crime occurred while the driver was on-duty (*id.* at 68), the licensee's driving record (*id.* at 68-69), whether the driver expressed remorse (*id.* at 88), whether the crime involved moral turpitude (*id.*), or any underlying facts of the criminal convictions (*id.* at 67-68). He explained that he "knew the TLC's overall policy was . . . if you had a criminal conviction, you were to be revoked." (Fioramonti Dep. 29; *see also id.* 67 (agreeing that the TLC had a zero tolerance policy regarding criminal convictions).) TLC prosecutor Marc Hardekopf testified to a similar understanding of TLC's policy: under his view of the standard, it is of no moment whether the criminal conviction is the licensee's first offense, whether it is in keeping with the

person's general character, or whether the licensee had a good record as a driver. (Hardekopf Dep. 72, Oct. 8, 2008.) According to TLC Deputy Commissioner for Legal Affairs and General Counsel Charles R. Fraser, "a felony conviction *per se* shows a lack of good moral character." (Fraser Decl., Oct. 15, 2009, ¶ 38.) With regard to operating under the influence of intoxicating liquor, Fraser stated that "the TLC has [] made the determination that the illegal use of alcohol while driving is per se inconsistent with licensure as a driver, and therefore license revocation is mandatory . . . when illegal use of alcohol while driving is proved." (Fraser Decl., Oct. 15, 2009, ¶ 25.)

Given the weight of this evidence, defendants appear to no longer seriously dispute whether a conviction results per se in revocation. (*See* Defs.' Mem. at 12 (framing the pivotal question as "whether the plaintiffs would reasonably have expected their convictions would render them unfit").) The Court sees no genuine dispute on this point. The Court concludes that the TLC had a per se policy to respond to plaintiffs' convictions with revocation.

> b.   *Fair warning must be based on the "good moral character" standard.*

Throughout the course of this litigation, two separate legal provisions have been offered to show that plaintiffs had fair notice that their convictions would prompt revocation proceedings. First, the Administrative Code includes a provision "for good cause shown relating to a direct and substantial threat to the public health and safety," allowing the TLC to "suspend a taxicab or for-hire vehicle license" and ultimately to "revoke such license." N.Y. Admin. Code § 19–512.1(a) (*quoted in Rothenberg I,* 2010 WL 3860425, at *2). Second, the TLC Rules provide for a fitness hearing "[i]f the [TLC] believes that a licensee . . . does not meet or does not continue to meet the qualifications for licensure, as set forth in [the TLC] Rules." TLC Rules § 8–15(a). As to the latter language, the qualifications for licensure in the TLC Rules include the requirement to

"be of good moral character." *Id.* § 2–02(a)(7). The Second Circuit's remand order calls upon this Court to consider the applicability of each of these two provisions. *See Rothenberg III*, 481 F. App'x at 572.

The "public health and safety" provision in Administrative Code Section 19–512.1(a) is facially inapplicable in this litigation. The text of the provision is limited to "a taxicab or for-hire vehicle license." Admin. Code § 19–512.1(a). Other provisions of the Code, by contrast, regard "a taxicab or for-hire vehicle *driver's* license." *See, e.g., id.* § 19–507.1(a)(1) (emphasis added). The Code defines a "[v]ehicle license" as a "taxicab license, coach license, wheelchair accessible van license or for-hire vehicle license issued by the commission," *id.* § 19–502(e), and, it separately defines a "[d]river's license" as "a license for a driver issued by the commission," *id.* § 19–502(d). The verbiage of the Code makes clear that Section 19-512.1(a) applies to licenses for vehicles and not to licenses for drivers.

Unlike the "public health and safety" provision, the "good moral character" requirement applies to drivers explicitly: it appears in a list of requirements for "[a]n applicant for a taxicab driver's license." *See id.* § 2–02(a). The section in which it arises is titled, "Requirements for a Taxicab Driver's License to Operate a Medallion Taxicab." *Id.* § 2–02. It therefore fits neatly into the "qualifications for licensure, as set forth in [the TLC] Rules," *id.* § 8–15(a), and accordingly, an interruption in a licensee's good moral character fits squarely into Section 8–15(a)'s provision for a fitness hearing.

The Court concludes that the "public health and safety" standard cannot have provided fair warning to plaintiffs that their conduct's consequences would include license revocation, because that provision is unrelated to plaintiffs' licenses. By contrast, the Court concludes that the "good moral character" standard is the appropriate provision under which to analyze whether fair warning existed.

17

       *c.   A reasonable driver would expect a conviction for assault or for possession of a forged instrument—but not for the non-criminal infraction of driving while ability impaired—to result in revocation.*

Conviction plaintiffs' vagueness challenge depends upon whether a reasonable person familiar with the "good moral character" standard, and with its purpose, would have expected plaintiffs' conduct to prompt their license revocations. As the Second Circuit explained, "[t]o the extent the court determines that the 'good moral character' standard is appropriate, . . . conviction plaintiffs cannot prevail if their conduct was so clearly within the ambit of the provision that they had warning that their conduct would lead to revocation." *Rothenberg III*, 481 F. App'x at 673. The issue at bar, therefore, is the extent to which *plaintiffs' conduct* fell within the good moral character standard.

This Court cannot conclude that as a general matter that standard puts drivers on notice that *all* criminal conduct automatically triggers revocation. (*See, e.g.*, Defs.' Mem. at 7.) Defendants argue for such a broad approach by pointing to the fingerprinting of applicants for taxicab driver's licenses, *see* TLC Rules § 2–02(c), to the requirement that taxicab and FHV drivers must notify the TLC of criminal convictions, *id.* §§ 2–63, 6–15(e), and to legislative history connecting the good moral character requirement with concerns about the erstwhile "criminal element in the industry" (Weinblatt Decl., filed July 12, 2013, Ex. D187 at 22). Yet many crimes do not involve moral turpitude. *See, e.g.*, *Mendez v. Mukasey*, 547 F.3d 345, 347 (2d Cir. 2008); *People v. Ford*, 205 A.D.2d 798, 798 (N.Y. App. Div. 2d Dept. 1994). Thus, a reasonable person familiar with the good moral character requirement would not assume that the mere fact of a criminal conviction—without knowing the nature of the crime—would prompt revocation.

The question presented is therefore whether the Administrative Code and the TLC Rules put a reasonable driver on notice that conviction

plaintiffs' conduct would result in revocation. The analysis depends in turn on whether the conduct contravened the good moral character requirement. *See Rothenberg III*, 481 F. App'x at 673 ("'[W]e must consider the context in which the regulation was enforced, *i.e.*, we must evaluate [plaintiffs'] underlying conduct by reference to the norms' of the taxi-licensee community." (quoting *Perez v. Hoblock*, 368 F.3d 166, 175-76 (2d Cir. 2004) (alterations in original)).)

A reasonable driver would be familiar with the Administrative Code and with the TLC Rules. Thus, he would understand that "good moral character" is a requirement to apply for a license, *see* N.Y. Admin. Code § 19–505(b)(5); TLC Rules § 2–02(a)(7), and he would further understand that requirement as continuing as long as he holds a license, *see* TLC Rules § 8–15(a). But the reasonable person has context. He knows that the TLC Rules include more specific provisions, such as: disqualification from licensure based on criminal convictions during a license probationary period, *see id.* § 2–04(b)(1)-(2); a prohibition against a driver "threaten[ing], harass[ing] or abus[ing] . . . while performing his responsibilities as a driver," *id.* § 2–60(a); a prohibition against "fraud, misrepresentation or larceny against a passenger," *id.* § 2–61(a)(1); a prohibition against "us[ing] . . . [a] taxicab for any unlawful purpose," *id.* § 2–61(b); a prohibition against "conceal[ing] evidence of a crime," *id.* § 2–61(c); and a requirement that a driver report criminal convictions to the TLC, *see id.* § 2–63(a).[3] The

---

[3] Recent amendments to the TLC Rules—published December 16, 2013, and effective January 15, 2014—add further detail to the penalties for specified criminal conduct. The amendments add, for example: that for the specific crimes already prohibited elsewhere in the rules, arrest is sufficient to trigger summary suspension; revocation proceedings for all felony convictions and for certain misdemeanor convictions; and specific factors that determine unfitness in light of a criminal offense. Plaintiffs overstate the relevance of the amendments. (*See* Letters of Daniel L. Ackerman, Feb. 5, 2014, Dkt. No. 178, Ex. at 3504.; Feb. 7, 2014, Dkt. No. 179; Feb. 11, 2014, Dkt. No. 181.) The new provisions did not exist at the

TLC Rules also recite certain penalties—such as fines, suspension, and revocation—that apply to violations of these provisions. *See id.* § 2–86.

The provisions regarding specific criminal conduct would not, however, narrow the reasonable person's interpretation of the good moral character requirement. Plaintiffs contend that the specific provisions concerning specific crimes foreclose a reasonable person from expecting a crime not specifically addressed in the rules to prompt revocation as a failure to maintain good moral character. But a reasonable person would not read the mention of specific crimes to *narrow* the residual good moral character requirement. A reasonable person would naturally think of criminal acts—at least the particularly immoral ones—as textbook failures of the good moral character standard. *See, e.g.,* Thomas W. Marrill & Henry E. Smith, *The Morality of Property*, 48 Wm. & Mary L. Rev. 1849, 1885 (2007). In the reasonable mind, that intuition would survive even after reading the other, more specific prohibitions related to specific criminal conduct.

Given the reasonable person's understanding of the relevant regulations, the Court can turn to the specific convictions in this action.

Kombo was convicted of assault in the second degree, a felony. (Pls.' 56.1 ¶ 147, Defs.' 56.1 ¶ 185.) He struck his ex-wife with an iron bar in his apartment. (Pls.' 56.1 ¶ 147; Defs.' 56.1 ¶ 192.) A reasonable person would consider an assault conviction to be inconsistent with any description of a person as being of good moral character. Put another way, a reasonable person who is required constantly to be of good moral character would expect that an assault conviction demonstrates noncompliance with that

---

time of plaintiffs' revocations and thus they could not have supported or undercut the extent of plaintiffs' fair warning. Nor are the amendments helpful in interpreting an older version of the Rules. *See EEOC v. Staten Island Sav. Bank*, 207 F.3d 144, 152 (2d Cir. 2000) ("[S]ubsequent legislative history is generally a hazardous basis for inferring [prior legislative] intent." (quoting *Pension Benefit Guaranty Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990)) (internal quotation marks omitted)).

standard. The Court concludes that Kombo had fair warning that conviction for second-degree assault would result in revocation.

Dyce was convicted of criminal possession of a forged instrument, a misdemeanor. (Pls.' 56.1 ¶ 150; Defs.' 56.1 ¶ 207.) While his taxicab sat parked, a sign bearing the emblem of the New York Police Department hung inside the taxi, despite Dyce's lack of affiliation with the NYPD. (Defs.' 56.1 ¶ 207.) Because possession of a forged instrument "certainly involves deceit," *Rodriguez v. Gonzales*, 451 F.3d 60, 64 (2d Cir. 2006), a reasonable person would associate it with a deficit of good moral character. Therefore, a reasonable driver convicted of that crime would reasonably expect it to demonstrate a lack of good moral character. The Court concludes that Dyce had fair warning that a conviction for possession of a forged instrument would result in revocation.

Ali was convicted of driving while ability impaired ("DWAI"), a non-criminal infraction. (Pls.' 56.1 ¶ 152; Defs.' 56.1 ¶ 217.) He was off-duty in upstate New York at the time of the infraction. (Pls.' 56.1 ¶ 152.) While a reasonable person describing another as "being of good moral character" would immediately backpedal when informed of a criminal conviction for assault or for possession of a forged instrument, that is not so in regard to the non-criminal infraction of DWAI. Ali's conviction was neither for a crime nor necessarily suggestive of a moral shortcoming. The Court therefore concludes that Ali did not have fair warning that his DWAI conviction would result in revocation.

### 2. *Drug test plaintiffs had fair warning that a failed drug test would prompt revocation.*

Drug test plaintiffs challenge as inadequate the notice they received that a failed drug test would result in license revocation. Defendants urge that TLC Rules 2–19(b) and 8–15(c) provided reasonable drivers fair notice that the TLC would revoke the license of any taxicab driver failing a drug

21

test "when a *determination* is made after a hearing that the licensee failed to rebut or reverse the positive drug test result." (Def.'s Mem. 13.)[4]

> a.   *Section 2–19(b) of the TLC Rules is ambiguous as to the mandatory or permissive nature of revocation.*

TLC Rule 2–19 is titled "Drug Testing of Licensed Taxicab Drivers." It requires that each driver "shall be tested annually, at the licensee's expense, for drugs or controlled substances, as set forth in § 3306 of the Public Health Law," TLC Rules § 2–19(b)(1), and that "[i]f the results of said test are positive, the driver's license may be revoked after a hearing in accordance with [TLC Rule] 8–15," *id.* § 2–19(b)(2). Section 8–15(c), in turn, sets forth procedures that follow failed drug tests:

> [T]he [TLC] may order the summary suspension of a driver's license to ensure the public safety in cases where the [TLC] receives notice that a licensee has failed a required drug test. The [TLC] shall notify the licensee either by personal service or by first class mail of the summary suspension, within five (5) calendar days of the suspension. An expedited fitness hearing shall be scheduled within ten (10) calendar days of such suspension. The hearing shall be conducted by an ALJ . . . , and based upon the ALJ's findings, either the suspension shall be lifted or the license shall be revoked.

Plaintiffs argue that, because the Rules discuss revocation with an ostensibly permissive standard—"the driver's license *may* be revoked," *id.* § 2–19(b)(2) (emphasis added)—a reasonable driver would lack fair notice that a failed drug necessarily results in revocation. Under defendants' interpretation of the Rules, however, the word "may" merely incorporates the possibility that the licensee can rebut or reverse the positive drug test

---

[4] The Second Circuit queried whether defendants rely on a separate section of the TLC Rules regarding drug addiction. *See Rothenberg III*, 481 F. App'x at 672. Defendants have clarified that they do not attempt to ground conviction plaintiffs' revocations in that section. (Def.'s Mem. 15-16.)

result at the fitness hearing. In other words, defendants interpret the phrase "the driver's license may be revoked after a hearing," *id.*, to mean that either of two outcomes is possible after a failed drug test: (1) the ALJ determines at the fitness hearing that the positive drug test result is rebutted or reversed; or (2) the ALJ determines that the positive drug test result is valid, that the driver is therefore unfit, and that the license must be revoked. (*See* Def.'s Mem. 13.)

On a plain reading of the rule alone, neither party's interpretation is less valid than the other. Legislators and regulators frequently use the word "may" to suggest a discretionary standard, in contrast to the mandatory standard suggested by the word "shall." *See, e.g., Nat. Res. Def. Council v. N.Y.C. Dep't of Sanitation*, 630 N.E.2d 653, 654-55 (N.Y. 1994). Yet the impact of the word "may" in this context is ambiguous because the entire phrase reads "the driver's license may be revoked *after a hearing*." TLC Rules § 2–19(b)(2) (emphasis added).

> b. *Other sections of the TLC Rules do not resolve the ambiguity in Section 2–19(b).*

Other sections of the TLC Rules fail to offer helpful guidance in resolving this ambiguity. For example, the analogous rule regulating FHV drivers more explicitly states that "[a] finding that the driver has failed said [drug] test *will result* in revocation of the driver's license." TLC Rules § 6–16(v)(2) (emphasis added).[5] Defendants offer this language as evidence that a reasonable person would understand a failed drug test to require revocation because the same standard would reasonably apply to taxicab and FHV drives alike. Yet the opposite inference is equally likely: a reasonable person might read the mandatory language of Section 6–16(v)(2) as evidence that the TLC could have used such explicitly

---

[5] Because drug test plaintiffs are taxicab drivers—and none are FHV drivers—this Opinion uses the drug test rules for FHV drivers merely as context with which to understand the analogous rules for taxicab drivers.

mandatory language in Section 2–19(b) if it had wanted revocation to be mandatory. Neither inference is persuasive, in light of the equally valid opposite inference.

Nor is the ambiguity resolved by the TLC Rules' treatment of on-duty drug use or impairment. Revocation is mandatory if a licensee operates a taxicab "while his driving ability is impaired by . . . drugs or other controlled substances," or if he consumes drugs while driving a taxicab, or if he consumes drugs within "six hours prior to driving or occupying such taxicab." TLC Rules § 2–20(a); *see id.* § 2–86. Plaintiffs have argued that these rules inform the purposes of the drug test and guide the way a reasonable person interprets the prospect of revocation for a failed drug test. *Cf. Rothenberg III*, 481 F. App'x at 671-72 (discussing proposed interpretation of Section 2–20(a) as "suggest[ing] that a failed drug test would not be grounds for revocation absent a finding of addiction or on-duty use"). But the text of the Rules treats a failed drug test as distinct from a violation of Section 2–20(a). After all, the provisions discussing drug test failures and resulting revocations read as a unit, connecting the test result to the fitness hearing to the revocation, in a straight line, without any reference to on-duty use, on-duty impairment, or addiction. *See* TLC Rules §§ 2–19(b); 8–15(c). The fact that drivers are prohibited from consuming drugs while on-duty does not affect a reasonable person's interpretation of the warning given by the discussion of a failed annual drug test. And the fact that the TLC Rules list mandatory revocation as the penalty for consuming drugs while on-duty does not affect a reasonable person's expectation of the penalty associated with a failed annual drug test.

     *c.*   *The regulatory history reveals Section 2–19(b)'s purposes and resolves the ambiguity in the text.*

Without clear guidance from the text of the TLC Rules, the Court looks next to the regulatory history as an interpretive aid. This use of regulatory history emerges from the standard at issue in the fair notice analysis,

which presumes that a reasonable person is "familiar with the conditions the regulations are meant to address and the objectives the regulations are meant to achieve." *Rock of Ages Corp. v. Sec'y of Labor*, 170 F.3d 148, 156 (2d Cir. 1999); *see Rothenberg III*, 481 F. App'x at 672. These conditions and objectives, in the context of the drug testing rules, are found in the Statement of Basis and Purpose that the TLC published when promulgating the rules in 1998. That Statement explains the rules thus:

> The amendments require the testing of new and renewal applicants for taxicab and for-hire vehicle driver's licenses for drugs and other controlled substances. The drugs and controlled substances that would be tested for include those listed in Section 3306 of the New York State Public Health Law. The possession or use of these substances is prohibited by law. A positive test result would lead to the denial of a new license application, and may lead to the denial of a renewal application following a hearing.

(Weinblatt Decl. Ex. D143 at 2264, May 28, 2010.) The Statements goes on to describe the purpose:

> The purpose of these proposed amendments to TLC regulations [adding a mandatory, scheduled drug test] is to promote the safety of passengers and the general public by ensuring that taxicab and for-hire vehicle drivers are not operating their vehicles when they are unfit because of impairment caused by drug, controlled substance or alcohol use. The regulations clearly establish a Commission policy of zero tolerance for licensees who use illegal substances, or who operate their vehicles while their ability to do so is impaired by substances, whether or not illegal.

(*Id.*)

Elsewhere in the regulatory history, then-TLC Chair Daus explains several findings related to required annual drug testing, and especially directed at new penalties for a driver's failure to be tested:

> Each day taxicabs and [FHVs] transport approximately 900,000 passengers. The vast number of New Yorkers affected by the use of taxicabs and [FHVs] requires that drivers be fit to operate such

25

vehicles. A drug-free driving force ensures the health and safety of passengers, other motorists and pedestrians in the City of New York.

The New York City Charter explicitly charges the Commission with the regulation and supervision of the industry of transportation of persons licensed by vehicles in the city, including the establishment of safety standards. . . . The City Council previously established that taxicab and [FHV] drivers must, as a requirement for licensure, not be addicted to the use of drugs or intoxicating liquors. . . . Using such requirement as a guideline, the [TLC] required that all drivers must annually submit to a drug test as proof that they are not using drugs or alcohol.

(*Id.* Ex. D153 at 4696, May 28, 2010.)

The overarching theme of the regulatory history is the TLC's blanket disapproval and prohibition of drug use among taxicab and FHV drivers. The strongest expressions of purpose in the regulatory history regard the possession or use of drugs and are not limited to on-duty use or addiction. The TLC's "policy of zero tolerance" is explicitly directed to "licensees who use illegal substances"—not merely to licensees who use them while driving or who drive while impaired. (*Id.* Ex. D143 at 2264.) Similarly, the assertion that "[t]he possession or use of these substances is prohibited by law" (*id.*), suggests that the purpose of the scheme relates to the basic possession and use of drugs, and is not limited to addiction, driving while impaired, or on-duty drug use. The objective of the regulation is not merely an addiction-free driving force, a driving-while-impaired–free driving force, or a drug-use-while-on-duty–free driving force; the objective is explicitly, clearly, and forcefully a "drug-free driving force." (*Id.* Ex. D153 at 4696.)

The regulatory history also notes that a positive drug test "would lead to the denial of a new license application, and may lead to the denial of a renewal application following a hearing." (*Id.* Ex. D143 at 2264.) Meanwhile, the same regulatory history refers to the penalty under TLC

Rules Sections 2–20 and 2–86 as "mandatory revocation of a . . . license for a conviction of operating a vehicle while impaired, or operating a vehicle within six (6) hours of consuming . . . controlled substances." *Id.* Again, the use of the word "may" with respect to a failed drug test might possibly suggest a more permissive standard, in contrast with the more explicitly non-permissive standard set forth by the words "mandatory revocation" for on-duty drug impairment and on-duty drug use. However, this aspect of the regulatory history is unhelpful in resolving the ambiguity in the Rules, because the phrase "may lead to the denial of a renewal application following a hearing" is susceptible of the same competing interpretations as the text currently in dispute ("[i]f the results of said test are positive, the driver's license may be revoked after a hearing," TLC Rules § 2–19(b)(2)). After all, in both the Rule in dispute and this aspect of the legislative history, the prepositional phrases "after a hearing" and "following a hearing" impose the same ambiguity.

The regulatory history also suggests a possible link between drug testing and the requirement that drivers not be addicted to drugs. Most notably, the TLC points to the non-addiction requirement as "a guideline" for its drug testing policy. (*See* Weinblatt Decl. Ex. D153 at 4696.) As the Second Circuit noted, one might read this invocation of the non-addiction requirement as "suggesting that the purpose of drug testing could have been to determine whether there was reason to believe a driver was addicted." *Rothenberg III*, 481 F. App'x at 672. A reasonable person would be familiar with the regulatory history's mention of the non-addiction requirement as "a guideline" for the drug testing requirement; however, that mention would not meaningfully affect a reasonable person's interpretation of Section 2–19(b)(2). The use of "guideline" in this context—namely, one requirement as "guideline" for another—is unusual and difficult to parse. Even if a reasonable person understood this opaque "guideline" relationship as imparting *purpose* on the annual drug test, such that the drug test serves the non-addiction requirement, the use of the indefinite article would foreclose the reader from limiting the drug test's

27

purpose to this relationship. In other words, to offer the non-addiction requirement as "a guideline" (rather than "the guideline") for drug testing does not inveigh against other guidelines or purposes for drug testing.

The ambiguity in Section 2–19(b)(2) and in the remainder of the TLC Rules leaves a reasonable person to resort to the stated objectives of drug testing as the strongest interpretive tool in resolving that ambiguity. The blunt "policy of zero tolerance," (Weinblatt Decl. Ex. D143 at 2264), and the emphatic purpose of a "drug-free driving force," (*id.* Ex. D153 at 4696), strongly support defendants' argument that a reasonable person would expect revocation to follow from an unrebutted positive drug test. Meanwhile, the more tenuous interpretive arguments surrounding the non-addiction requirement as "a guideline," and other language equally ambiguous as Section 2–19(b)(2) itself, are too weak to alter that conclusion. Reading the TLC Rules in the context of their purposes as stated in the regulatory history, a reasonable driver should expect a failed drug test to prompt revocation.

> d.   *The TLC Rules provided fair warning of the "cold sample" policy.*

The parties next dispute whether a reasonable driver had fair warning that his submission of a cold urine specimen for drug testing would result in license revocation.

Every taxicab driver is required to "be tested annually, at the licensee's expense, for drugs or controlled substances." TLC Rules § 2–19(b)(1). And, as discussed above, "[i]f the results of said test are positive, the driver's license may be revoked after a hearing." *Id.* § 2–19(b)(2). A reasonable person would understand this language to require a driver to submit annually to a valid drug test, so a reasonable person would understand a driver's evasion of a valid drug test as having the same adverse result as a failed drug test. Thus, to the extent that a cold urine sample indicates that the driver has attempted to cheat the test, a

28

reasonable person would understand the TLC Rules as providing for license revocation when a driver submits a cold sample.

The evidence in the record is undisputed that a cold urine sample suggests adulteration or substitution. According to the U.S. Department of Health and Human Services's guidelines for federal workplace drug testing, "[i]f the temperature of the specimen is outside the range of 32°-38°C/90°-100°F, that is a reason to believe that the donor may have altered or substituted the specimen." (Weinblatt Decl. Exh D68 at 19656, October 15, 2009.) Plaintiffs counter simply that the federal guidelines are not binding on the TLC. While plaintiffs are correct that these guidelines do not create a legal standard, the guidelines would nonetheless inform a reasonable person's interpretation of a cold urine sample in workplace drug testing. This information adds support to a reasonable person's common-sense intuition that a cold urine sample indicates adulteration or substitution.

Plaintiff Abood appeared at a drug testing facility for his annual test on April 6, 2006. (*See* Def.'s 56.1 ¶ 134-35.) He donated a urine specimen in complete privacy. (*See id.* ¶ 136.) When he submitted the specimen to laboratory staff five minutes later, its temperature was below 90 degrees Farenheit. (*See id.* ¶ 135; 142.) In accordance with the facility's established procedure, Abood provided a second urine specimen over an hour later. (*See id.* ¶ 135.) As with the first donation, he donated this second sample in privacy. (*See id.* ¶ 136.) Like the first, this second sample had a temperature below 90 degrees Farenheit. (*See id.* ¶ 135.)

Abood's cold samples would have created in any reasonable observer an inference that they were adulterated or substituted. The same reasonable observer would have notice from Section 2–19(b) of the TLC Rules that adulterating or substituting drug test samples prompts revocation as assuredly as a positive drug test does. Thus, Abood had fair warning that revocation would result from his cold samples.

**C. Conviction plaintiffs had adequate notice of their hearings but drug test plaintiffs lacked adequate notice.**

"The touchstone of due process, of course, is 'the requirement that a person in jeopardy of serious loss [be given] notice of the case against him and opportunity to meet it.'" *Spinelli v. City of New York*, 579 F.3d 160, 169 (2d Cir. 2009) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 348-49 (1976)) (alteration in original). The constitutional adequacy of notice depends on the same factors as *Mathews* balances for other due process determinations: "(1) the private interest affected, (2) the risk of erroneous deprivation through the procedures used and the value of other safeguards, and (3) the government's interest." *Id.* at 170 (citing *Mathews*, 424 U.S. at 335.). "Notice, to comply with due process requirements, . . . must set forth the alleged misconduct with particularity." *In re Gault*, 387 U.S. 1, 33 (1967) (internal quotation marks omitted); *see Spinelli*, 579 F.3d at 172 ("[D]ue process notice contemplates specifications of acts or patterns of conduct.").

**1. Hearing notices to conviction plaintiffs were adequate because further specification of the alleged misconduct would have provided no further due process.**

Applying the *Mathews* balancing test to conviction plaintiffs' notices, the Court examines the various interests at stake as well as the extent to which the notices affected the risk of erroneous deprivation.

**a. The Private Interest Affected**

The private interest at stake for each plaintiff is substantial. For a taxicab or FHV driver, a license is "essential in the pursuit of a livelihood." *Bell v. Burson*, 402 U.S. 535, 539 (1971). A fitness hearing for a TLC-licensed driver represents an adjudication of his ability to continue in his employment within New York City. Plaintiffs' notice of their fitness hearings held the potential to shape those hearings by affecting plaintiffs' preparation.

### b.   *The Risk of Erroneous Deprivation*

Examining the "risk of an erroneous deprivation" under "the procedures used" by the TLC, *Mathews*, 424 U.S. at 335, the Court examines the hearing notices themselves. After conviction plaintiffs' convictions, each received a hearing notice directing him to appear for the hearing at a given date and time. (*E.g.*, Defs.' 56.1 ¶ 306; *accord* Pls.' Mem. at 31.) The notice then stated that "[t]he purpose of this hearing" was "to determine your fitness to maintain a TLC license in light of your final disposition in your criminal case." (*E.g.*, Defs.' 56.1 ¶ 306; *accord* Pls.' Mem. at 31.) It goes on to require the recipient to "provide the Commission with both a copy of the criminal court complaint from your criminal case and your final certificate of disposition." (*E.g.*, Defs.' 56.1 ¶ 306; *accord* Pls.' Mem. at 31.) The notice further clarifies that "as a result of this hearing, a recommendation may be made to revoke your TLC license." (*E.g.*, Defs.' 56.1 ¶ 306; *accord* Pls.' Mem. at 31.) A final paragraph in the hearing notice tells the driver of his right to legal counsel at the hearing and of his right to "present relevant evidence and call necessary witnesses." (*E.g.*, Defs.' 56.1 ¶ 306; *accord* Pls.' Mem. at 31.)

Because the notice cites the "final disposition in your criminal case," directing the recipient to submit "the criminal court complaint" and "final certificate of disposition" (*e.g.*, Defs.' 56.1 ¶ 306), the notice presumes that its recipient already has knowledge of the conviction. Because the recipient had been convicted, there was no requirement for the notice to needlessly recapitulate information underlying the conviction in order to "set forth the alleged misconduct with particularity." *In re Gault*, 387 U.S. at 33.

To contend that these notices presented a risk of erroneous deprivation, plaintiffs point to two purported omissions: (1) "what, if any provision of the regulations plaintiffs had violated," and (2) "what facts apart from the conviction (if any) might be considered." (Pls.' Mem. at 31.)

First, the notice could have included what TLC Rules or Administrative Code section the driver allegedly violated. The type of

31

notice that plaintiffs received—"[a] notice for a fitness hearing"—was required to set forth "the basis for the [TLC]'s charge that the respondent is not fit to possess or retain a license issued by the [TLC]." TLC Rules § 8–06(b). By contrast, different types of notices were required to set forth "the Rule of Administrative Code Section alleged to have been violated." *Id*. § 8–06(a)(iii). The government was already required to include this information in some notices, so adding it to plaintiffs' notices was clearly an option available to the government. But the availability of the information does not mean that it is required by the Fourteenth Amendment to be part of the notification. Where the *Mathews* test looks to the "risk of an erroneous deprivation" generated by the shortcoming of due process, 424 U.S. at 335, plaintiffs have not explained how a hypothetical notice that cites to the good moral character requirement would have affected the risk of an erroneous deprivation in their cases. There is no reason to think that a hearing notice citing the relevant section of the TLC Rules might result in a different outcome than did the actual hearing notice—which clearly explained that the conviction was the reason for the hearing.

The second omission plaintiffs point to is that the notice did not include any description of what facts might help the driver at the driver's fitness hearing. Due process notice need not provide a roadmap for a successful defense. The requirements that notice include "specifications of acts or patterns of conduct," *Spinelli*, 579 F.3d at 172, does not create an obligation to explain how the respondent might go about overcoming the allegations. Moreover, for conviction plaintiffs Kombo and Dyce who should reasonably have foreseen revocation resulting from their convictions, *see supra*, section III.B.1, notice that conviction alone prompted the fitness hearing also put them on notice that the conviction alone was the critical fact.

### c.   The Government's Interest

Finally, the government interest in any driver's fitness hearing is substantial. The New York City Charter charges the TLC with establishing standards for safety and licensing. *See* N.Y.C. Charter § 2300. To that end, the Charter gives the TLC power over "revocation[ and] suspension of licenses for drivers . . . and the establishment of qualifying standards required for such licenses." *Id.* § 2303(5). "Each day taxicabs and [FHVs] transport approximately 900,000 passengers" in New York City. (Weinblatt Decl. Ex. D153 at 4696, May 28, 2010.) The TLC's efforts to maintain a qualified force of taxicab and FHV drivers in order to protect the safety of the public is a critically important interest of the government. That said, defendants have not explained what sort of burden the government would face if it added more detail to conviction plaintiffs' hearing notices. If such detail would have provided greater safeguard to conviction plaintiffs' rights, then the government interest would probably not stand in the way of requiring such detail.

### d.   Conclusion

In the absence of an articulable risk of erroneous deprivation from the actual notices, and in the absence of a proposal for the government to have more specifically set forth the alleged misconduct of conviction plaintiffs, the hearing notices afforded conviction plaintiffs adequate due process.

### 2.   *Hearing notices to drug test plaintiffs were inadequate because they provided plaintiffs with no information about what drug was present.*

To examine the adequacy of drug test plaintiffs' notices, the Court proceeds anew with the *Mathews* balancing test.

### a.   The Private Interest Affected

Like conviction plaintiffs, each drug test plaintiff has a substantial private interest in preparing for his hearing and presenting a defense.

Because a TLC license is, to each plaintiff, "essential in the pursuit of a livelihood," *Bell*, 402 U.S. at 539, drug test plaintiffs' livelihoods were at stake, manifestly a substantial private interest. *See supra*, section III.C.1.a.

### b.   The Risk of Erroneous Deprivation

The notices sent to drug test plaintiffs informed them of the following: "The [TLC] has been advised that the result of your recent drug test was positive. Your license has been suspended, pursuant to Section 8–16(a), based upon a finding by the [TLC] that emergency action is required to ensure public safety." (Defs.' 56.1 ¶ 316; *accord* Pls.' Mem. at 31.) The notice goes on to direct the recipient to appear at a time and place for the fitness hearing, "[t]he purpose of [which] will be to determine your fitness to maintain a TLC license in light of the positive drug test result." (Defs.' 56.1 ¶ 316.) The notice also apprises the driver of his right to representation by counsel and of his right to "present evidence and witnesses in your defense." (*Id.*) Finally, it provides the following instructions for drivers who believe that their drug test results were affected by legitimate medication:

> If you were taking medication that could have caused the positive result, please send Doctors Review Service copies from your pharmacy or physician of your prescriptions. Please fax them to Doctors Review Service . . . . You have the right to request a retest of your original specimen (not a new drug test). . . . You can request that a different laboratory perform the retest. . . . If you have any further questions, please contact the Legal Department at (212) 676-1135.

(*Id.*)

To contend that this notice is inadequate, plaintiffs point out that it "does not even identify the drug for which the driver tested positive or the quantity of drug residue allegedly found." (Pls.' Mem. at 31.) Defendants counter that "the relevant plaintiffs had already been contacted by the medical review officer, at which time the drug test results were disclosed

to them, and they were given an opportunity to provide a medical explanation for the positive drug test result." (Defs.' Mem. at 7.) But nothing in the record—including the deposition testimony cited by defendants as support—states that anybody provided information to plaintiffs concerning what specific drug had been found in the testing rather than simply a statement that the test result was positive for the presence of drugs. (*See, e.g.*, Weinblatt Decl. Ex. D273 at 40-41, 51-52, Aug. 9, 2013 (asserting that the majority of positive drug tests result in contact "to give the donor the option and ability to verify why they have this drug in their urine," but not asserting that the contact includes identification of the drug)).

Where a deprivation of property is based on a positive drug test result, information about the drug itself lies at the core of the alleged misconduct. A person does not have "notice of the case against him and opportunity to meet it," *Mathews*, 424 U.S. at 348-49, without information about the drug he is alleged to have consumed. The consequent risk of erroneous deprivation is evident: the respondent loses his chance to defend himself or to rebut the accuracy of the drug test when he does not receive the core allegation against him.

### c.   The Government's Interest

The government interest in a taxicab or FHV driver's fitness hearing is, again, substantial due to the connection between licensure and public safety, *see supra*, section III.C.1.c, but the government has not put forth facts showing a substantial cost of improved notice. The Court presumes that it would be relatively simple from an administrative and cost perspective to add specificity to the hearing notice regarding the identity of the drug that the TLC alleges the driver to have consumed.

### d.   Conclusion

The Court concludes as a matter of law that drug test plaintiffs were denied due process when the notice of their fitness hearings did not provide information about the drug that resulted in the positive drug test.

## D.   Plaintiffs' right to a meaningful hearing was adequately protected by the combination of their post-deprivation hearings and their right to Article 78 review.

Another cornerstone of due process is "that some form of hearing is required before an individual is finally deprived of a property interest." *Mathews*, 424 U.S. at 333. This hearing must take place "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965). Again, the Court uses the factors in *Mathews*'s balancing test to examine the adequacy of the process afforded to plaintiffs. *See Rothenberg III*, 481 F. App'x at 675.

### 1.   Plaintiffs were not entitled to pre-deprivation hearings.

"Due process does not, in all cases, require a hearing before the state *interferes* with a protected interest, so long as 'some form of hearing is [provided] before an individual is finally deprived of [the] property interest.'" *Nnebe v. Daus*, 644 F.3d 147, 158 (2d Cir. 2011) (quoting *Brody v. Village of Port Chester*, 424 F.3d 121, 134 (2d Cir. 2005)) (emphasis and alterations in original). Although there is a "general rule" in favor of pre-deprivation hearings, *Brody*, 434 F.3d at 135, the three-factor balancing test under *Mathews* "'provides guidance' in determining whether to 'tolerate' an exception to the rule requiring pre-deprivation notice and hearing." *Krimstock v. Kelly*, 306 F.3d 40, 60 (2d Cir. 2002) (quoting *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 53 (1993)).

Here, the private interest is vast, because plaintiffs' licenses are predicates to their employment as taxicab and FHV drivers. Also strong is the government's interest in regulating the taxicab and FHV industry

given the connection between licensure and public safety. In fact, "among the most critical functions performed by the TLC are ensuring the safety of the taxi-riding public and maintaining the public's trust in the safety of taxis." *See Nnebe*, 644 F.3d at 159 (quoting *Nnebe v. Daus*, 665 F. Supp. 2d 311, 324 (S.D.N.Y. 2009)).

The risk of erroneous deprivation settles the matter: although the temporary deprivation is serious in the time between suspension and the post-deprivation revocation hearing, "the risk of erroneous deprivation is mitigated by the availability of a prompt post-deprivation hearing." *Id.* For this reason, the Second Circuit concluded that a pre-deprivation hearing was not required between the arrest of a TLC licensee and the suspension of his license. *See id.* After all, "in the immediate aftermath . . . , when the TLC has minimal information at its disposal and the very fact of [the conviction or drug test result] is cause for concern, the government's interest in protecting the public is greater than the driver's interest in an immediate hearing." *Id.* The same conclusion is appropriate with respect to convictions and positive drug tests.

This Court concludes that no pre-suspension hearing is required, so long as the post-deprivation hearing is adequate.

### 2.   *Plaintiffs' TLC adjudications—except for Ali's—represented adequate post-deprivation hearings.*

In determining the adequacy of the post-deprivation hearing, the *Mathews* factors again set forth the analytical rubric.

Plaintiffs have a substantial interest in a robust post-deprivation hearing, since the hearing affects plaintiffs' ability to earn a livelihood. However, plaintiffs' interest in an infinitely robust fitness hearing is diminished by their ability to seek review of their revocations pursuant to Article 78 of the New York Civil Practice Law and Rules. *See Rothenberg III*, 481 F. App'x at 676 ("[W]here a due process violation is based on an established procedure rather than a random, unauthorized act, the

availability of additional process in an Article 78 proceeding . . . is a relevant factor in the *Mathews* analysis."). Plaintiffs have access to the New York courts via Article 78, allowing them to challenge whether a revocation is "supported by substantial evidence." N.Y. C.P.L.R. § 7803(4) (McKinney 2008). This opportunity for further review does not, of course, entirely vitiate plaintiffs' interest in an accurate determination at the fitness hearing. Notably, their opportunity for Article 78 review is limited in two critical ways: First, even an expeditious Article 78 review takes time and would therefore leave the driver temporarily deprived of his license. Second, Article 78's deferential standard of "supported by substantial evidence," *id.*, would present an obstacle to review a revocation based on an ALJ's inaccurate but well-supported determination. Those restrictions leave plaintiffs with a cognizable interest in a fair post-deprivation hearing at the TLC, but Article 78 lessens the import of plaintiffs' interest.

The government's interest is in a logistically feasible and cost-effective hearing. These interests are significant. Yet the government does not have a persuasive interest in urgency or "in a streamlined procedure" in this post-deprivation context, *Rothenberg III*, 481 F. App'x at 675, because the suspension has already satisfied any urgency in distancing unfit drivers from the taxicab- and FHV-riding public.

The risk of erroneous deprivation is, once again, the pivotal factor in this analysis. Plaintiffs' fitness hearings contained the significant hallmarks of due process that protect against erroneous deprivation: the licensees had the opportunity to be represented by counsel (*see* Defs.' 56.1 ¶¶ 28, 306, 316); many of them exercised that right and were indeed represented by counsel (*see* Defs.' 56.1 ¶¶ 117, 139, 156, 171); adjournments at licensees' request were routinely granted (*see id.* ¶¶ 79, 81, 117, 176, 400); at each hearing, an ALJ issued written findings of fact (*id.* ¶ 45, 86); drivers received copies of the ALJs' written recommendations (*id.* ¶ 48); and each plaintiff had an opportunity to object in writing to the recommendation (*id.*). In addition, the content of the adjudication, based on whether it

followed a conviction or a failed drug test, helps to inform the risk of erroneous deprivation, so the Court analyzes separately those hearings.

> a.  *Conviction plaintiffs received adequate due process to the extent that the TLC's practice of per se revocations for convictions was constitutionally valid.*

In the dispute over the hearings afforded to conviction plaintiffs, the fulcrum is the extent to which the licensee can present to the ALJ evidence of his choosing. As the Second Circuit noted "'the record strongly suggests that, whether *de facto* or *de jure*, an ALJ is strictly prevented from considering anything other than the identity of the driver and the offense of which he was convicted." *Rothenberg III*, 481 F. App'x at 675 (quoting *Nnebe*, 644 F.3d at 161).

In a revocation hearing that follows a conviction, the meaningful evidence begins and ends with the conviction. The evidence includes a certified copy of the conviction—the "Certificate of Disposition"—which contains information about the charge, disposition, and sentence. (Defs.' 56.1 ¶ 41.) The evidence sometimes includes a copy of the criminal complaint, and sometimes it does not. (*Id.*) The driver is allowed to submit evidence of his own to show that the certificate contains incorrect information or that he is not the person who was convicted. (*Id.* ¶ 42.)

A convicted driver may present mitigating evidence at his revocation hearing, including that the conviction does not demonstrate unfitness or poor moral character. (*Id.*; Hardekopf Decl. ¶ 23, May 28, 2010; Fraser Decl. ¶ 33, Oct. 16, 2009.) But the record unequivocally shows that ALJs do not consider mitigating evidence when recommending whether to revoke a respondent's license. (Fraser Decl. ¶ 38; Hardekopf Dep. 72; Fioramonti Dep. 67-69, 88.) The hearing does not provide a meaningful opportunity for a driver to defend himself other than by disproving the fact of his conviction. For example, the driver cannot explain why he committed the

39

crime of which he was convicted, and he cannot argue that the conviction is consistent with his being of good moral character.

Consequently, whether the procedure poses a risk of erroneous deprivation depends entirely on whether a per se revocation for a conviction—blind to any mitigating facts or defenses—is an erroneous deprivation. For plaintiffs Kombo and Dyce, a per se revocation for conviction did not violate any due process guarantee, as explained above. *See supra*, section III.B.1.a. For plaintiff Ali, this per se revocation was constitutionally infirm, because the standard that triggered this automatic revocation—the good moral character standard—failed to put him on notice that his conviction for driving while ability impaired would result in per se revocation. *See id.* Thus, for Kombo and Dyce, any mitigating facts or defenses would have been irrelevant: revocation was (validly) based solely on the driver's identity and conviction, so there was no risk of erroneous deprivation when his meaningful opportunity to be heard was limited to his identity and conviction. For Ali, however, the incapacity to explain, justify, or defend his conduct presented a risk of erroneous deprivation: his non-criminal conviction might not have demonstrated unfitness, and the adjudication therefore needed to give him a chance to prove as much.

> b.   *Drug test plaintiffs received adequate due process, because the drug tests were reliable.*

In the fitness hearings of drivers with positive drug test results, the risk of erroneous deprivation hinges largely on the accuracy of the drug testing.

The evidence at such a hearing includes paperwork reflecting the chain of custody, the drug test result, and the certification of that result from the drug testing service. (Defs.' 56.1 ¶ 80.) The ALJ also receives a memorandum from the TLC, explaining what drug was found and in what amount, and comparing that result to cutoff levels published in federal

guidelines. (*Id.*) At the hearing, the driver has an opportunity to provide a medical explanation for the drug test result. (*Id.* ¶ 81.) The driver can also present other evidence, such as proof of mistaken identity or of defective testing procedures. (*Id.* ¶ 82.)

Because the core evidence is the drug test result, a drug test that risks an erroneous result would also risk an erroneous deprivation. To begin the process of an annual drug test, a TLC-licensed driver contacts the Laboratory Corporation of America—an accredited independent laboratory, known as "LabCorp.," to which the TLC outsourced its drug testing. (Defs.' 56.1 ¶¶ 54, 59, 66.) The driver makes an appointment at a LabCorp. Location, where he donates a urine sample in private, observes as the sample is packaged and labeled, and provides written acknowledgment that the labeled sample is his own. (*Id.* ¶ 66.) A LabCorp. employee measures the temperature of the sample. (*Id.*) Any sample in the acceptable temperature range of 90° to 100° Fahrenheit is sent for testing. (*Id.*) The drug test protocol involves an initial screen by immunoassay testing and a confirmation using Gas Chromatography/Mass Spectrometry ("GC/MS"). (*Id.* ¶ 66.) LabCorp. tests for five drugs: marijuana, cocaine, opiates, PCP, and amphetamines. (*Id.* ¶ 67.) Any positive drug test result requires review by a medical review officer ("MRO"), who examines the laboratory results. (*See id.* ¶ 68; Swotinsky Dep. 84.) The MRO also attempts to contact the driver in order to ask for any medical explanation for the result. (Dash Dep. 45-46.) Where the MRO learns of a medical prescription that explains the drug test result, he changes the failing result to a passing result. (*See id.*; Defs.' 56.1 ¶ 68.)

The testing at issue is impressively accurate. According to defendants' expert, Dr. Robert Swotinsky, the analysis's rate of error is close to zero. (Swotinsky Dep. 32.) Plaintiffs' expert, Dr. James Woodford, does not dispute this conclusion: his affidavit makes no assertion of the testing's accuracy or inaccuracy, except to insist that "[t]here is no scientific basis for the [] assumption" that the GC/MS testing is 100% accurate. (Woodford

Aff. ¶¶ 10-11, 32.) Dr. Woodford goes on to explain ways in which the protocol could be *more* accurate (*id.* ¶¶ 14-15, 24), but in the course of those explanations, Dr. Woodford does not provide a reason to believe that LabCorp.'s testing presents a risk of inaccurate results. There is no true conflict between Dr. Swotinsky's averment that the testing protocol produces *nearly* perfect results and Dr. Woodford's assertions that the testing protocol is not perfect. The Court sees no genuine dispute that the entire protocol, with its layers of scientific testing and human checks, has appropriate and admirable accuracy.

This conclusion is consistent with the conclusions other courts have reached regarding the reliability of the same tests. For example, when the U.S. Supreme Court considered the U.S. Customs Service's drug testing of its employees, it wrote: "as the Court of Appeals noted, the combination of [an immunoassay] and GC/MS tests . . . is highly accurate, assuming proper storage, handling, and measurement techniques." *Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656, 672 n.2 (1989); *see also Moxley v. Regional Transit Svcs.*, 722 F. Supp. 977, 981 (W.D.N.Y. 1989) (confirmatory testing by GC/MS analysis is "highly accurate" (quoting *id.*)); *Seelig v. Koehler*, 546 N.Y.S.2d 828, 829 (App. Div. 1st Dep't 1989) ("Positive findings must be confirmed by a different technique, a [GC/MS], which is apparently virtually infallible."), *aff'd*, 76 N.Y.2d 87, 95 (1990). This conclusion is also consistent with LabCorp.'s independent accreditation by both the College of American Pathologists and the Centers for Medicare and Medicaid Services—the organization that regulates laboratory drug testing pursuant to the federal Public Health Services Act, 42 U.S.C. § 263(a), 263a. (*See* Weinblatt Decl. Ex. 66.)

The Court concludes that the risk of erroneous results from the drug testing is slight indeed. Any risk of a false positive from the immunoassay is mitigated by the GC/MS confirmation plus the review of the laboratory results by the MRO. To the extent that a driver's positive result has a legitimate medical explanation, the MRO attempts to obtain that

information and the driver is able to introduce that evidence at the fitness hearing. To the extent that the process leaves room for error in the chain of custody, the fitness hearing addresses this risk by considering LabCorp.'s chain of custody form as evidence.

To add further checks would import minimal benefit to an already reliable procedure. Plaintiffs propose such further safeguards as an opportunity to cross-examine laboratory technicians, different methods for the drug test analysis, and increasing the review obligations of MROs. None of these costly and inefficient additions is necessary, because the protocol that tested plaintiffs was robust and reliable. This conclusion is buttressed by plaintiffs' ability to seek Article 78 review in the New York State courts to seek the discovery and cross-examination that they believe would enhance the accuracy of their fitness hearings. The Court concludes that drug test plaintiffs' hearings afforded them due process.

### E.   A genuine dispute remains as to the impartiality of the ALJs.

The right to be heard, guaranteed by due process, must involve a hearing "before a disinterested and impartial judicial officer." *Ward v. Vill. of Monroeville*, 409 U.S. 57, 58 (1972). Accordingly, "[e]very procedure which would offer a possible temptation to the average man as a judge to forget the burden of proof . . . , or which might lead him not to hold the balance nice, clear, and true between the state and the accused denies the latter due process of law." *Tumey v. Ohio*, 273 U.S. 510, 532 (1927); *see also Capterton v. A.T. Massey Coal Co.*, 129 S. Ct. 2252, 2259 (2009).

In the context of administrative tribunals, "[p]olicies designed to insure a reasonable degree of uniformity among ALJ decisions are not only within the bounds of legitimate agency supervision but are to be encouraged." *Nash v. Bowen*, 869 F.2d 675, 680 (2d Cir. 1989). At the same time, those policies must "not directly interfere with 'live decisions.'" *Id.*; *see Rothenberg III*, 481 F. App'x at 677. After all, "[t]o coerce ALJs into . . . deciding more cases against claimants [] would, if shown, constitute . . . a

43

clear infringement of decisional independence." *Nash*, 869 F.2d at 681 (internal quotation marks omitted).

The Court's analysis begins with the "presumption of honesty and integrity" of the ALJs. *Withrow v. Larkin*, 421 U.S. 35, 47 (1975). "This presumption can be rebutted by a showing of conflict of interest or some other specific reason for disqualification." *Schweiker v. McClure*, 456 U.S. 188, 196 (*quoted in Rothenberg III*, 481 F. App'x at 677). Thus, the Court considers whether the undisputed material facts rebut the presumed honesty of the ALJs who adjudicated plaintiffs' fitness hearings.

Plaintiffs point to several possible incentives to ALJs that might render the TLC hearings impermissibly biased. Under the system of TLC adjudications that included plaintiffs' fitness hearings, ALJs were per diem, at-will employees of the TLC. (*See* Pls.' 56.1 ¶ 82; Defs.' 56.1 ¶ 234.) The Chairman of the TLC hired them. (*See* Pls.' 56.1 ¶ 83.) They did not receive a steady flow of work: rather, each month, they would apply for work assignments, which the TLC distributed or withheld as it wished. (*See* Pls.' 56.1 ¶ 84; Defs.' 56.1 ¶¶ 245-246.) Their continued employment and continued assignment of work could be terminated without cause at any time. (*See* Pls.' 56.1 ¶ 84.) Although plaintiffs assert that former TLC Chairman Daus fired two individuals for their pro-driver approach to adjudications, the circumstances and motivation behind those terminations remain unclear. (*Compare* Pls.' 56.1 ¶¶ 90-91, *with* Defs.' Responses to Pls.' Post-Remand Rule 56.1 Statement ("Defs.' Counter-56.1") ¶¶ 90-91.)

The ALJs were also subject to supervision. Plaintiffs have documented at least one instance of an ALJ, Eric Gottlieb,[6] receiving criticism from the Deputy Chief ALJ after recommending that certain driver suspensions be lifted. (Pls.' 56.1 ¶¶ 95, 97.) In the same communication, the Deputy Chief

---

[6] ALJ Gottlieb conducted the fitness hearing for plaintiff Abood. (*See, e.g.*, Defs.' 56.1 ¶ 139.)

ALJ requested that ALJ Gottlieb telephone him in the future before issuing similar rulings. (*Id.* ¶ 98; Defs.' Counter-56.1 ¶ 98.) Indeed, ALJ Gottlieb testified that he hesitated to issue another pro-driver ruling "[b]ecause [he] knew that [his] supervisors would be very upset" and "would probably consider that to be insubordination." (Gottlieb Dep. 18.) He further testified at his deposition that he believed he would have been either fired or reassigned to a less desirable location if he had issued the pro-driver ruling. (*Id.* at 88.)

The evidence, however, is not clear-cut. Out of the many ALJs who conducted fitness hearings, ALJ Gottlieb's impressions form the lion's share of plaintiffs' evidence and even ALJ Gottlieb admitted that his supervisor never articulated to him that negative consequences would follow a pro-driver determination. (*Id.* at 89.) Thus, plaintiffs' evidence of institutional bias is not overwhelming. Militating against any inference of institutional bias is defendants' showing that the transfer of fitness hearings from TLC ALJs to OATH ALJs has not produced any change in the outcomes of the hearings. (Defs.' 56.1 ¶¶ 53, 77.)

The significant evidence for and against the existence of impermissible bias on the part of the TLC ALJs represents a genuine dispute. Although plaintiffs have proffered considerable evidence of bias, the dispute remains in light of the presumption of honesty and defendants' countervailing evidence.[7]

---

[7] This bias—if present as plaintiffs contend—would present a significant risk of erroneous deprivation. The Court is unable to judge the risk of erroneous deprivation arising out of the disputed institutional bias. Thus, the Court need not analyze the other *Mathews* factors—including the interests at stake and whether the availability of Article 78 review affects those interests—with respect to the ALJs' alleged bias.

**F.   This Court will not exercise jurisdiction over plaintiffs' state law claims, which could have been asserted in Article 78 proceedings.**

Plaintiffs' claims based on state and local law generally allege that their revocations were based on defendants' *ultra vires* acts or otherwise violated due process rights guaranteed by the New York State Constitution. Because Article 78 of the C.P.L.R. provides a state proceeding for such claims, this Court will not exercise supplemental jurisdiction over them.

Article 78 creates a special "Proceeding Against Body or Officer," allowing petitioners to challenge:

1. whether the body or officer failed to perform a duty enjoined upon it by law; or

2. whether the body or officer proceeded . . . in excess of jurisdiction; or

3. whether a determination was made in violation of lawful procedure, was affected by an error or law or was arbitrary and capricious or an abuse of discretion, including abuse of discretion as to the measure or mode of penalty or discipline imposed; or

4. whether a determination was made as a result of a hearing held, and at which evidence was taken, pursuant to direction by law is, on the entire record, supported by substantial evidence.

N.Y. C.P.L.R. § 7803.

Several district courts have reasoned that the terms of Article 78 deprive federal courts of discretion to entertain such claims, because C.P.L.R. Section 7804(b) limits in what courts a petitioner can bring an Article 78 claim. *See, e.g.*, *Morningside Supermarket Corp. v. N.Y. State Dep't of Health*, 432 F. Supp. 2d 334, 346 (S.D.N.Y 2006); *Beckwith v. Erie Cnty. Water Auth.*, 413 F. Supp. 2d 214, 226-27 (W.D.N.Y. 2006); *Blatch* ex rel. *Clay v. Hernandez*, 360 F. Supp. 2d 595, 637 (S.D.N.Y. 2005); and *Cartagena v. City of New York*, 257 F. Supp. 2d 708, 709-10 (S.D.N.Y. 2003) ("I do not have

discretion to exercise supplemental jurisdiction over an Article 78 claim."). Other district courts, assuming that they had discretion to exercise jurisdiction over Article 78 claims, have declined to exercise that jurisdiction pursuant to 28 U.S.C. § 1367(c).[8] *See, e.g., Birmingham v. Ogden*, 70 F. Supp. 2d 353, 372 (S.D.N.Y. 1999); *Camacho v. Brandon*, 56 F. Supp. 2d 370, 280 (S.D.N.Y. 1999) *Lucchese v. Carboni*, 22 F. Supp. 2d 256, 258 (S.D.N.Y. 1998).

In response, plaintiffs simply say they have not asserted any Article 78 claim. (Pls.' Reply at 33.) It is irrelevant that the complaint does not formally invoke Article 78, because plaintiffs have asserted state law claims that challenge the TLC's revocation of their licenses, contending that the defendants have exceeded their jurisdiction, have acted inconsistent with the state laws that bind them, and have otherwise violated state procedures. In so doing, plaintiffs have asserted claims "usually brought in this type of dispute via an Article 78 proceeding." *Cartagena*, 257 F. Supp. 2d at 709; *see, e.g., Carniol v. N.Y.C. Taxi & Limousine Comm'n*, 975 N.Y.S.2d 842 (Sup. Ct. 2013) (Article 78 challenge to TLC's revocation of taxi driver's license, arguing that the revocation hearing violated the City Charter and the State Constitution); *Mankarios v. N.Y.C. Taxi & Limousine Comm'n*, 853 N.Y.S.2d 69 (App. Div. 1st Dep't 2008) (Article 78 challenge to TLC's denial of taxi driver's license renewal application, arguing that the TLC neglected to fully "weigh [petitioner's] achievements against the facts" of his misconduct); *Arif v. N.Y.C. Taxi & Limousine Comm'n*, 770 N.Y.S.2d 344 (App. Div. 1st Dep't 2004) (Article 78 challenge to TLC's revocation of taxi driver's licenses, arguing that the standard used by the TLC was inconsistent with the N.Y.C. Administrative Code); *Udodenko v. City of New York*, 780 N.Y.S.2d 869 (Sup. Ct. 2004) (Article 78 challenge to TLC's revocation of taxi driver's license for failure

---

[8] "The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . (4) in exception circumstances, there are other compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c).

to submit to drug test, arguing that the circumstances of his revocation violated the N.Y.C. Administrative Code, that the TLC's drug testing requirements violated CAPA, and that the notice of his revocation hearing was inadequate to fulfill his procedural due process right); *cf. Stern v. Ambach*, 516 N.Y.S.2d 319 (App. Div. 3rd Dep't 1987) (Article 78 challenge to constitutional adequacy of notice of license revocation hearing).

The Court either is not permitted to exercise jurisdiction over plaintiffs' state and local law claims or it has discretion to decline to exercise jurisdiction over those claims, and it does so here.

## IV. CONCLUSION

For the foregoing reasons, the Court hereby ORDERS that:

1. As to plaintiffs' claim that they were denied due process because they lacked fair notice that their conduct would result in a deprivation of their property (*see* Am. Compl. ¶¶ 145-147; *supra* section III.B):

   a. Summary judgment is granted in favor of plaintiff Ali.

   b. Summary judgment is granted in favor of defendants with respect to the claims of plaintiffs Rothenberg, Abood, Kombo, Katsigiannis, Doumbia, and Dyce.

2. As to plaintiffs' claim that they were denied due process because they received inadequate notice of their fitness hearings, thereby depriving them of a meaningful right to be heard (*see* Am. Compl. ¶¶ 141-144; *supra* section III.C):

   a. Summary judgment is granted in favor of drug test plaintiffs Rothenberg, Abood, Katsigiannis, and Doumbia.

   b. Summary judgment is granted to defendants with respect to the claims of conviction plaintiffs Kombo, Dyce, and Ali.

3. As to plaintiffs' claim that they were denied due process because their post-deprivation hearings failed to provide them a meaningful hearing (*see* Am. Compl. ¶¶ 141-144; *supra* section III.D):

   a. Summary judgment is granted in favor of plaintiff Ali.

      b. Summary judgment is granted in favor of defendants with respect to the claims of plaintiffs Rothenberg, Abood, Kombo, Konstantinos, Katsigiannis, Doumbia, and Dyce.

4. As to plaintiffs' claim that they were denied due process because their adjudications took place before biased TLC tribunals (*see* Am. Compl. ¶¶ 136-140; *supra* section III.E), summary judgment is denied as to all parties.

5. As to plaintiffs' claims arising out of state law (*see supra* section III.F), summary judgment is granted to defendants.

Dated:  New York, New York
       July 31, 2014

                    SO ORDERED:

                    Sidney H. Stein, U.S.D.J.