USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  3/27/15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SAUL ROTHENBERG, EBRAHIM ABOOD,
TOBBY KOMBO, KONSTANTINOS
KATSIGIANNIS, BOUBACAR DOUMBIA,
ROBERT DYCE, and MOUSTACH ALI,
individually and on behalf of all others
similarly situated,

                        Plaintiffs,

       -against-

MATTHEW DAUS, DIANE MCGRATH-
MCKECHNIE, JOSEPH ECKSTEIN,
ELIZABETH BONINA, THOMAS COYNE,
THE NEW YORK CITY TAXI AND
LIMOUSINE COMMISSION, and THE
CITY OF NEW YORK,

                        Defendants.

08-Cv-567 (SHS)

OPINION & ORDER

SIDNEY H. STEIN, U.S. District Judge.

    Plaintiffs—former drivers of taxicabs and for-hire vehicles—bring this
putative class action against the City of New York and various officials of
the New York City Taxi and Limousine Commission (the "TLC") for
violations of their Fourteenth Amendment right to due process based on
the revocation of their licenses by the TLC.  On July 31, 2014, this Court
granted partial summary judgment to defendants and partial summary
judgment to plaintiffs, and concluded that a genuine dispute of material
fact exists as to whether plaintiffs' adjudications took place before biased
TLC tribunals.  *Rothenberg v. Daus*, 08-cv-567, 2014 WL 3765724 (S.D.N.Y.
July 31, 2014).  The parties have now cross-moved for reconsideration of
the July 31 determination pursuant to Rule 59(e) of the Federal Rules of
Civil Procedure and Local Rule 6.3.  The Court grants defendants' motion

insofar as it finds that (1) the individual defendants are entitled to qualified immunity for their actions and therefore summary judgment is granted in favor of the individual defendants, dismissing them from this litigation; and (2) there is a factual question as to whether the drug test plaintiffs received notice of the specific drug found in their drug tests prior to their fitness hearings. Defendants' motion for reconsideration is otherwise denied. The Court denies plaintiffs' motion for reconsideration in full, as it fails to identify any intervening changes in controlling law or new factual matters that warrant reconsideration.

## I.  INTRODUCTION

The facts and procedural history of this case are set forth fully in the July 31 Opinion & Order, and the Court assumes the parties' familiarity with it. Defendants move for reconsideration of the July 31 Opinion on four grounds: (1) the Court should dismiss the claims against the individual defendants because they are entitled to qualified immunity; (2) the Court overlooked key evidence and law when it found that a genuine dispute of material fact exists as to the claim that the ALJs exhibit an impermissible, systemic bias against the drivers; (3) the Court similarly overlooked applicable law in ruling that plaintiff Ali did not have fair notice that his conduct would result in a deprivation of property; and (4) the Court failed to account for record evidence that the drug test plaintiffs were advised of the specific type of drug for which they tested positive prior to their fitness hearings.

Plaintiffs move for reconsideration of the July 31 Opinion on five grounds: (1) the Second Circuit's remand order, *see Rothenberg v. Daus*, 481 F. App'x 667 (2d Cir. 2012) (the "Remand"), precludes the Court from finding that a *per se* determination of unfitness is constitutionally valid; (2) New York law forbids the inference that a forged instrument or assault conviction is determinative of poor character; (3) the finding in the July 31 Opinion that a fitness hearing is fair, even if the hearing does not allow for individual fact determination, is inconsistent with the Remand; (4) the

Court's reliance on regulatory history to resolve certain ambiguities in the TLC Rules is improper and conflicts with the Remand; and (5) the Court's ruling on supplemental jurisdiction is impermissible because it was *sua sponte*.

## II.  LEGAL STANDARD

"[R]econsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995).  Thus, "[t]he standard for granting such a motion is strict," *id.*, and the decision to grant or deny a motion for reconsideration remains within the "sound discretion of the district court," *Learning Annex Holdings, LLC v. Rich Global, LLC*, 860 F. Supp. 2d 237, 241 (S.D.N.Y. 2012). "The major grounds justifying reconsideration are an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) (internal quotation marks omitted).

A motion for reconsideration "is not a vehicle for relitigating old issues, presenting the case under new theories . . . or otherwise taking a 'second bite at the apple.'" *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 (2d Cir. 1998).  "The purpose of Local Rule 6.3 is to ensure the finality of decisions and to prevent the practice of a losing party examining a decision and then plugging the gaps of a lost motion with additional matters." *Learning Annex*, 860 F. Supp. 2d at 241 (internal quotation marks omitted).

## III.  DISCUSSION

The Court turns first to defendants' motion for reconsideration and then turns to plaintiffs' motion.

### A.   Defendants' Motion for Reconsideration is Granted in Part

#### 1.   *The individual defendants are entitled to qualified immunity*

The Court grants defendants' motion to reconsider to the extent that defendants seeks a ruling on whether the individual defendants—Matthew Daus, Diane McGrath-McKechnie, Joseph Eckstein, Elizabeth Bonina, and Thomas Coyne—are entitled to qualified immunity because the Court did not rule on this issue in the July 31 Opinion.  On reconsideration, the Court finds that the individual defendants are entitled to qualified immunity.

##### a.   *Background*

Plaintiffs bring individual claims against (1) Matthew Daus, the Chairperson of the TLC at the time of plaintiffs' license revocations; (2) Daus's predecessor, former Chairperson Diane McGrath-McKechnie; (3) Joseph Eckstein, Deputy Commissioner for Adjudications; (4) Elizabeth Bonina, Chief ALJ; and (5) Thomas Coyne, Deputy Chief ALJ.  According to plaintiffs, the individual defendants were each involved in either the formulation of the TLC policies and ALJ Manual or the supervision of ALJs.  Plaintiffs contend that these individuals should be held liable for any due process violations resulting from plaintiffs' license revocations. Defendants assert that plaintiffs have not adduced any evidence that the individual defendants, aside from Daus, had any personal involvement in the revocation of plaintiffs' TLC licenses and therefore cannot be individually liable for such violations.  Moreover, even if they had been involved, defendants maintain that the individual defendants are entitled to qualified immunity because the due process rights asserted in this action were not clearly established at the time of the challenged conduct such that a reasonable person would have knowledge that his or her actions were unlawful.

### b. Legal Standard

"In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry." *Tolan v. Cotton*, 134 S. Ct. 1861, 1865 (2014). First, the court asks "whether the facts, taken in the light most favorable to the party asserting the injury . . . show the officer's conduct violated a federal right[,]" and second, the court asks "whether the right in question was clearly established at the time of the violation." *Id.* at 1865-66 (internal quotation marks omitted). Thus, officials are entitled to qualified immunity as a matter of law when they can establish that either "a constitutional right was [not] violated" or "the right was not clearly established [at the time of the violation]." *Raspardo v. Carlone*, 770 F.3d 97, 113 (2d Cir. 2014) (alterations in original) (internal quotation marks omitted).

In order to determine whether the right at issue is clearly established, courts "look to whether (1) the right was defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has confirmed the existence of the right, and (3) a reasonable defendant would have understood from the existing law that his conduct was unlawful." *Bailey v. Pataki*, 708 F.3d 391, 404-05 (2d Cir. 2013). "Few issues related to qualified immunity have caused more ink to be spilled than whether a particular right has been clearly established . . . because courts must calibrate, on a case-by-case basis, how generally or specifically to define the right at issue." *Golodner v. Berliner*, 770 F.3d 196, 205 (2d Cir. 2014). Courts should be mindful not to define the right too broadly or too narrowly but should follow "a middle course" where the definition is "particularized in the sense that the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 206 (internal quotation marks omitted). Although the court does not "require a case directly on point . . . existing precedent must have placed the . . . constitutional question beyond debate." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011).

Because Section 1983 "applies by its terms only to individual 'persons' responsible for violating plaintiffs' rights," plaintiffs must also show "that the defendant[s] caused the plaintiff[s] to be deprived of a federal right." *Raspardo*, 770 F.3d at 115.  That is, "[i]f a defendant has not *personally* violated a plaintiff's constitutional rights, the plaintiff cannot succeed on a § 1983 action against the defendant."  *Id.*; *see also Ashcroft v. Iqbal,* 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").  Accordingly, "[e]vidence of a supervisory official's 'personal involvement' in the challenged conduct is required."  *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 753 (2d Cir. 2003); *see also Iqbal*, 556 U.S. at 677 (rejecting the contention that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution").

Prior to *Iqbal*, the Second Circuit had identified five ways in which a supervisory official may be personally involved in a constitutional violation:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [plaintiffs] by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995); *see also Hernandez v. Keane*, 341 F.3d 137, 145 (2d Cir. 2003).  In addition to establishing one of the *Colon* categories, a plaintiff must also show that the supervisory

6

official's actions were a proximate cause of the constitutional violation. *Poe v. Leonard*, 282 F.3d 123, 134 (2d Cir. 2002).

The Second Circuit "ha[s] not yet determined the contours of the supervisory liability test . . . after *Iqbal*." *Raspardo*, 770 F.3d at 117; *see also Reynolds v. Barrett*, 685 F.3d 193, 205 n.14 (2d Cir. 2012) (recognizing the conflict between *Iqbal* and *Colon* but declining to decide the issue). Although this Court has already expressed its position that "the five *Colon* categories supporting personal liability of supervisors still apply as long as they are consistent with the requirements applicable to the particular constitutional provision alleged to have been violated," *see Qasem v. Toro*, 737 F. Supp. 2d 147, 151-52 (S.D.N.Y. 2010) (Stein, J.), other district courts have disagreed as to which *Colon* categories survive *Iqbal*. *Compare Martinez v. Perilli*, No. 09-cv-6470, 2012 WL 75249, at *4 (S.D.N.Y. Jan. 5, 2012) ("[T]he five *Colon* categories still apply after *Iqbal*."), *with Bellamy v. Mount Vernon Hosp.*, No. 07-cv-1801, 2009 WL 1835939, at *6 (S.D.N.Y. June 26, 2009) ("Only the first and part of the third *Colon* categories pass *Iqbal*'s muster."); *see also Aguilar v. Immigration & Customs Enforcement Div. of the U.S. Dep't of Homeland Sec.*, 811 F. Supp. 2d 803, 814-15 (S.D.N.Y. 2011) (collecting cases and noting that *Iqbal* may be limited to those constitutional claims which require a showing of discriminatory intent).

Finally, even if (1) the Court finds that the supervisor's conduct violated a constitutional right, and (2) clearly established law prohibits the violation, a supervisor is still entitled to qualified immunity if "a jury, viewing all facts in the light most favorable to plaintiff, could conclude that officers of reasonable competence could disagree on the legality of the defendant's actions." *Poe*, 282 F.3d at 146; *see also Davis v. Scherer*, 468 U.S. 183, 190 (1984) ("Even defendants who violate [clearly established] constitutional rights enjoy a qualified immunity that protects them from liability for damages unless it is further demonstrated that their conduct was unreasonable under the applicable standard.").

### c.   Discussion

#### i.   Adequacy of notice and post-deprivation hearings

All of the individual defendants played supervisory roles, aside from Daus who acted both as a supervisor and the final decision-maker.  For purposes of this discussion, the Court will assume that the individual defendants were personally involved in the constitutional deprivations the Court identified in the July 31 Opinion.  That is, the individual defendants (1) denied conviction plaintiff Ali due process because they did not provide fair notice that his conduct—the non-criminal infraction of driving while ability impaired under the New York Vehicle and Traffic Law—would result in the deprivation of his license, (2) denied the drug test plaintiffs Rothenberg, Abood, Katsigiannis, and Doumbia due process because they received inadequate notice of their fitness hearings when they were not told the specific drug found in their positive drug tests,[1] and (3) denied plaintiff Ali due process because his post-deprivation hearing failed to provide him a meaningful hearing.[2]

---

[1] Although the Court reconsiders this holding in Section III.A.4—and on reconsideration determines that there is a factual issue as to whether or not the drug test plaintiffs were informed of the specific drug in the relevant drug test prior to their fitness hearings such that summary judgment was inappropriate—the Court will analyze the qualified immunity question as if the drug test plaintiffs had not been informed of the specific drug because even if they had not been so informed, the Court finds that the individual defendants are entitled to qualified immunity.

[2] Putting Daus aside, the Court notes, however, that there is a dearth of evidence to support plaintiffs' contention that these individual defendants were personally involved in the notice and hearing violations.  Although plaintiffs' unsupported allegations alone would require a grant of summary judgment to the remaining individual defendants, given the unsettled state of the law at the Second Circuit, the Court will assume these defendants were personally involved since the Court finds that the individual defendants, including Daus, are entitled to qualified immunity on other grounds.

Since the Court found in the July 31 Opinion that plaintiffs' due process rights were violated, the Court must determine "whether the right in question was 'clearly established' at the time of the violation." *Tolan*, 134 S. Ct. at 1866. Plaintiffs contend that the rights to fair warning, adequate notice and a fair hearing were clearly established at the time of the revocations in 2006 and 2007, citing, *inter alia, Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985), *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982), and *Mathews v. Eldridge*, 424 U.S. 319 (1976). However, plaintiffs define the rights at much too broad a level. *See al-Kidd*, 131 S. Ct. at 2084 (2011) ("We have repeatedly told courts . . . not to define clearly established law at a high level of generality."). It is not that defendants provided no notice, warning, or post-deprivation hearing to plaintiffs. Rather, the constitutional deprivations (and the rights at issue) depend on (1) the specificity of the notice provided to plaintiffs who failed a drug test and (2) the fair warning provided by the "good moral character" standard by which the TLC can determine drivers' fitness for licensure. *See* 35 R.C.N.Y. § 2-02(a)(7).[3] Recognizing that the Court must define the right with reasonable specificity, plaintiffs "can point to no relevant case law declaring the [TLC policies], or any substantially similar policy, invalid" under the due process clause of the Fourteenth Amendment. *Redd v. Wright*, 597 F.3d 532, 536 (2d Cir. 2010).

Prior to the present revocations, no Second Circuit or U.S. Supreme Court precedent addressed the present TLC policies. *See Moore v. Vega*, 371 F.3d 110, 114 (2d Cir. 2004) ("Only Supreme Court and Second Circuit precedent existing at the time of the alleged violation is relevant in deciding whether a right is clearly established."). Another district court had examined the TLC policies in connection with suspensions of taxi drivers who refused service based on racial animus. That court held that

---

[3] In this Opinion, the Court continues to cite to the earlier version of the TLC Rules in effect at the time of plaintiffs' revocation proceedings. (*See* July 31 Op. at 5 n.1.)

the failure to provide pre-suspension hearings to taxi drivers who refused service violated due process because there was no immediate threat to public safety and the post-suspension hearings "provided little, if any, protection of the taxicab driver's due process rights."  *See Padberg v. McGrath-McKechnie*, 203 F. Supp. 2d 261, 276-82 (E.D.N.Y. 2002), *aff'd on other due process grounds*, 60 F. App'x 861 (2d Cir. 2003).  But the operative concern in *Padberg* was the high risk of erroneous deprivation given that "[t]he fate of the drivers [wa]s . . . entirely dependent on the impressions of the TLC inspectors" who evaluated the drivers' motives in refusing service.  *Id.* at 278.

The *Padberg* court distinguished its facts from prior Supreme Court precedent which upheld license suspensions with no pre-deprivation hearings where they (1) involved threats to public health and safety and (2) were based on objective facts, such as drug tests and criminal records, because "the nature of the infraction leaves little room for error."  *Padberg*, 203 F. Supp. 2d at 279; *see also Mackey v. Montrym,* 443 U.S. 1, 13-14 (1979); *Barry v. Barchi*, 443 U.S. 55, 65 (1979).  The present facts are much more aligned with *Mackey* and *Barry* than *Padberg*.  The entire revocation scheme at issue involved notices and post-deprivation hearings predicated on an objective consideration—a failed drug test or a conviction for criminal and non-criminal infractions.[4]  Therefore, to the extent that any court

---

[4] Although the good moral character standard is a subjective criterion, plaintiff Ali's license was revoked because he was found to be a threat to public safety based on an objective fact, namely, his conviction for driving while ability impaired ("DWAI"). (Defs.' Rule 56.1 Statement of Material Undisputed Facts ("Defs.' 56.1") ¶ 227, Dkt. No. 152.)  Even though the July 31 Opinion discredited the public safety basis for his revocation, "officers of reasonable competence could disagree on the legality of" Ali's revocation, *Poe*, 282 F.3d at 146, as a reasonable ALJ may have viewed Ali's continual disregard for traffic laws—he had five prior DMV convictions in addition to his DWAI conviction (*see* Defs.' 56.1 ¶ 223)—and the attendant concern for public safety, to be indicative of his unfitness for licensure.  (*See* July 31 Op. at 37 ("[A]mong the most critical functions performed by the TLC [is] ensuring the safety of the taxi-riding public." (internal quotation marks omitted))).

questioned the constitutionality of the TLC policies at issue, it is distinguishable from the case at bar.

But even if the rights were clearly established at the time of the revocations, the individual defendants would be entitled to qualified immunity because they acted reasonably given the established rights. At the time of the conduct, state court decisions had considered the constitutionality of the TLC's revocation policy under similar circumstances, and several Article 78 opinions had upheld the revocations. *See Milano v. N.Y.C. Taxi & Limousine Comm'n*, 761 N.Y.S.2d 29 (App. Div. 2003) (affirming revocation based on the petitioner's use of an illegal substance); *see also Fung v. Daus*, 846 N.Y.S.2d 104 (App. Div. 2007) (affirming revocation based on petitioner's use of an illegal substance and noting that 35 R.C.N.Y. § 2–19(b)(2) provides notice to drivers that their license may be revoked upon failing a drug test); *Akbar v. N.Y.C. Taxi & Limousine Comm'n*, 756 N.Y.S.2d 741 (App. Div. 2003) (affirming revocation where petitioner offered a bribe to a TLC taxi dispatcher). A reasonable official might assume that (1) the drug notices were sufficient given the TLC's zero-tolerance policy and the Medical Review Officers' ("MRO") possible disclosure of the positive drug to drivers who failed a drug test; and (2) the TLC licensing requirements provided fair notice to a driver convicted of DWAI given the full scope of TLC rules and regulations (*e.g.*, the rule providing that a license may be suspended in emergency circumstances for public health and safety, the zero-tolerance drug policy, and the notice and hearings provided therein). *See McCullough v. Wyandanch Union Free Sch. Dist.*, 187 F.3d 272, 278 (2d Cir. 1999) ("The question [for qualified immunity purposes] is not what a lawyer would learn or intuit from researching case law, but what a reasonable person in the defendant's position should know about the constitutionality of the conduct.").

In sum, the Court finds that the individual defendants are protected by qualified immunity as to the adequacy of notice provided to the drug

test plaintiffs and the adequacy of notice and post-deprivation hearings provided to Ali.

### ii.   Systemic Bias of ALJs

The individual defendants are also entitled to qualified immunity on plaintiffs' claim that the ALJs are systemically biased against the drivers. As an initial matter, plaintiffs have adduced no facts to suggest that either McGrath-McKechnie or Eckstein had any personal involvement in the biased tribunal claim; there is no evidence that either defendant's action fell within any of the five ways a supervisory official may be found personally liable under *Colon*. Thus, plaintiffs' systemic bias claim against defendants McGrath-McKechnie and Eckstein fail as a matter of law. *See Iqbal*, 556 U.S. at 676-77 ("[E]ach Government official, his or her title notwithstanding, is only liable for his or her own misconduct."); *see also Hayut*, 352 F.3d at 753.

Plaintiffs have presented evidence, albeit disputed, that defendants Daus, Coyne, and Bonina had some involvement in the systemic bias claim. For instance, plaintiffs adduced evidence that former Chairperson Daus may have been involved in the firing of two ALJs for ruling against the TLC and challenging TLC practices. (*See* Pls.' Post-Remand Rule 56.1 Statement in Support of their Renewed Mot. for Summ. J. ("Pls.' 56.1") ¶¶ 90-91, Dkt. No. 150.)[5] Plaintiffs also presented evidence that defendant Coyne supervised ALJ Gottlieb, whose testimony is the crux of plaintiffs' systemic bias claim, and instructed ALJ Gottlieb that one of his recommendations against license suspension was "improper" and that he should contact Coyne before issuing other pro-driver recommendations. (Pls.' 56.1 ¶¶ 97-98.) Defendant Bonina drafted the ALJs' schedules and

---

[5] Plaintiffs' evidence actually shows that David Hind terminated the employment of the two ALJs (*see id.*), but viewing the evidence in the light most favorable to plaintiffs, as the Court must, *see Tolan*, 134 S. Ct. at 1866, the Court will accept Daus's involvement in the firings solely for purposes of this motion.

was involved in the review of another of ALJ Gottlieb's recommendations against revocation, advising Coyne that although he could not tell ALJ Gottlieb how to decide the case, supervisors "have an obligation to point out . . . when a decision is blatantly wrong."  (*See* Pls.' 56.1 ¶ 106.)  Such factual contentions, if credited, support an argument that these defendants created an unspoken policy or custom that predisposed the ALJs to rule in the TLC's favor.  While the Second Circuit has not conclusively resolved whether this type of supervisor conduct may lead to personal liability in Section 1983 claims, *see supra* Section III.A.1.b, the Court need not decide the issue because it finds that defendants Daus, Coyne, and Bonina are entitled to qualified immunity on other grounds.

To determine whether defendants Daus, Coyne, and Bonina are protected by qualified immunity, the Court must consider "whether the facts, taken in the light most favorable to [plaintiffs] . . . show the officer[s]' conduct violated a federal right[,]" and "whether the right in question was clearly established at the time of the violation." *Tolan*, 134 S. Ct. at 1865-66 (internal quotation marks omitted).  If the Court "determines that one prong is not satisfied, it need not reach the other." *Raspardo*, 770 F.3d at 113.  Although there is a genuine factual dispute as to whether defendants violated plaintiffs' right to an unbiased tribunal, construing the facts in a light most favorable to plaintiffs, *see Tolan*, 134 S. Ct. at 1866, the Court finds that the right in question was not so clearly established at the time of the violation, and therefore defendants are entitled to qualified immunity.

The Court agrees with plaintiffs that the right to a neutral adjudicator in administrative proceedings was established decades ago.  *See, e.g.*, *Withrow v. Larkin*, 421 U.S. 35, 46 (1975); *Gibson v. Berryhill*, 411 U.S. 564, 578-79 (1973).  A biased decision-maker renders a fitness hearing constitutionally infirm; such impermissible bias may arise from either the prejudgment of the facts or a personal interest in the outcome of a case. *See Gibson*, 411 U.S. at 578-79; *see also Withrow*, 421 U.S. at 47.

Nonetheless, at the time of the revocations, the Second Circuit had carved out exceptions to this rule. For instance, the Second Circuit had held that due process does not require a neutral adjudicator in pre-deprivation administrative hearings where the plaintiffs have the ability to pursue impartial post-deprivation judicial review in an Article 78 proceeding. *See Locurto v. Safir*, 264 F.3d 154, 174-75 (2d Cir. 2001) ("An Article 78 proceeding . . . constitutes a wholly adequate post-deprivation hearing for due process purposes" including the resolution of bias claims); *see also Munafo v. Metro. Transp. Auth.*, 285 F.3d 201, 214 (2d Cir. 2002); *Longo v. Suffolk Cnty. Police Dep't*, 429 F. Supp. 2d 553, 559-60 (E.D.N.Y. 2006) (collecting cases).[6]

Arguably, a reasonable person in defendants' position may have viewed the same Article 78 proceeding as sufficient for purposes of due process after the post-deprivation hearings here. *See Munafo*, 285 F.3d at 214 (reversing a denial of qualified immunity where the plaintiff could have pursued his contention that his *post*-suspension hearing officers were biased in an Article 78 proceeding); *see also Locurto*, 264 F.3d at 174 (applying its holding "to the situation where the state affords plaintiff,

---

[6] In *Locurto*, the Second Circuit held that the impartial Article 78 review satisfied due process regardless of whether the decision-maker's bias was the result of a random, unauthorized act or an established government procedure. 264 F.3d at 173 ("Because . . . we conclude that due process is satisfied so long as the government provides a neutral adjudicator at the post-termination hearing for a tenured public employee, the question of 'random and unauthorized' conduct becomes moot, and we therefore need not address it."). Even assuming that the individual defendants'—namely Daus's—misconduct constituted an established government procedure because he was a high-ranking official with "final authority over significant matters," *see Rivera-Powell v. N.Y.C. Bd. of Elections*, 470 F.3d 458, 465-66 (2d Cir. 2006) (internal quotation marks omitted); *DiBlasio v. Novello*, 344 F.3d 292, 302-03 (2d Cir. 2003), reasonable officials could disagree as to whether a post-deprivation hearing with a non-neutral adjudicator is constitutionally adequate under *Mathews* given the availability of Article 78 review. *See Locurto*, 264 F.3d at 173-75; *Rivera-Powell*, 470 F.3d at 466-68.

subsequent to his termination, a full adversarial hearing before a neutral adjudicator" such as in an Article 78 proceeding).  Although the Remand identified a potential inconsistency between *Locurto* and previous Supreme Court precedent, *see* 481 F. App'x at 677 *(*citing *Ward v. Vill. of Monroeville*, 409 U.S. 57, 61-62 (1972) and *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 618 (1993)), it does not appear that lower courts were alerted to or resolved this tension before the instant hearings occurred.[7]  As no precedent at the time of the violation had put the relevant constitutional question—whether due process requires a neutral decision-maker in a post-deprivation hearing where there is impartial review in a subsequent state proceeding—"beyond debate," *al-Kidd*, 131 S. Ct. at 2083, qualified immunity shields defendants Daus, Coyne, and Bonina from personal liability.[8]

### 2.    *A genuine dispute remains as to the impartiality of the ALJs*

Next, defendants contend that summary judgment should have been granted in their favor on plaintiffs' systemic bias claim for four reasons: (1) the Court overlooked key evidence to explain why ALJ recommendations were skewed in favor of the TLC; (2) the Court placed too much weight on the firing of two ALJs and the criticisms received by one; (3) the partiality of ALJs is immaterial given that the Chairperson

---

[7] In fact, Second Circuit decisions subsequent to the Remand in this action have continued to hold that Article 78 proceedings cure any alleged bias by an administrative tribunal in a pre-deprivation hearing.  *See Leary v. Civil Serv. Emps. Ass'n Region 3*, 516 F. App'x 42, 43 (2d Cir. 2013) ("The entire basis of this appeal [including a biased tribunal claim] is foreclosed by precedents of this Circuit and of the Supreme Court" because "[e]mployees who wish to challenge the basis for their termination before a neutral adjudicator may do so in a post-termination proceeding under Article 78 of New York's Civil Practice Law and Rules.").

[8] It is unnecessary to reach defendants' argument that the individual defendants are entitled to absolute immunity because their conduct involved quasi-judicial functions, since defendants raise the argument for the first time in their motion for reconsideration.  *See, e.g., Sequa Corp.*, 156 F.3d at 144.

makes the final recommendation, citing 35 R.C.N.Y. § 8-15(e) and *Nnebe v. Daus*, No. 06-cv-4991, 2014 WL 3891343, at *1, *10 (S.D.N.Y. Aug. 8, 2014); and (4) due process does not require an impartial adjudicator because of the availability of subsequent judicial review pursuant to Article 78, *see, e.g.*, *Locurto v. Safir*, 264 F.3d 154, 174-75 (2d Cir. 2001).

Defendants fail to point to any controlling decisions or data they presented which the Court overlooked in its decision.  The Court noted in its July 31 Opinion that plaintiffs' evidence was neither "clear-cut" nor "overwhelming." (July 31 Op. at 45.)  The Court also underscored that the circumstances surrounding the firing of two ALJs remained "unclear." (*Id.* at 44.)  Defendants' discussion regarding the much lower rates of outcomes in favor of the TLC at other types of hearings (*e.g.*, consumer complaint cases), despite the ALJs facing the "same purported pressures of being per diem, at-will employees" is merely further evidence of a genuine factual dispute.  (Defs.' Memorandum of Law in Support of their Motion for Reconsideration at 4 ("Defs.' Mem."), Dkt. No. 196.)

Finally, defendants contend that the Second Circuit has conclusively determined that due process does not require an impartial decision-maker because of the availability of Article 78 review, citing *Locurto*, 264 F.3d at 174-75.  But this contention is flawed, as the Second Circuit questioned the continued viability of *Locurto* in light of the Supreme Court's decisions in *Ward v. Village of Monroeville*, 409 U.S. 57, 61-62 (1972) and *Concrete Pipe & Products of California, Inc. v. Construction Laborers Pension Trust for Southern California*, 508 U.S. 602, 618 (1993), which hold that the availability of appellate procedures or a new trial does not necessarily cure the failure to provide a neutral decision-maker in the first instance.  481 F. App'x at 677.[9] Defendants do cite *Wolkenstein v. Reville*, 694 F.2d 35, 44 (2d Cir. 1982), which distinguishes the criminal adjudication in *Ward* with an

---

[9] The Second Circuit ultimately "express[ed] no view as to whether . . . any [purported] bias was cured by the availability of Article 78 proceedings."  *Id.*

administrative setting, where there is "prompt, full, and inexpensive judicial review."  But this argument is a non-starter considering that the July 31 Opinion failed to reach the question of how the availability of Article 78 review affects the *Mathews* balancing test given the open factual questions on the systemic bias claim. (*See* July 31 Op. at 45 n.7.)  On reconsideration, the Court maintains its position that summary judgment on the systemic bias claim was properly denied as to all parties.

### 3. *Ali did not receive fair notice that his conduct would result in a deprivation of property*

Defendants also seek reconsideration of that part of the July 31 Opinion that granted summary judgment to plaintiff Ali on the ground that he did not receive fair notice that his conduct would result in a deprivation of his property.  Defendants assert that "the Court found Admin. Code Section 19-512.1 inapplicable [], but omitted consideration of whether 35 R.C.N.Y. § 8-16 independently, and/or coupled with the 'good moral character' fitness requirement, gave Ali fair notice." (Defs.' Mem. at 9.)  What defendants fail to mention is that they never argued in their summary judgment briefing that 35 R.C.N.Y. § 8-16 either independently or coupled with the "good moral character" requirement gave Ali fair notice.  This is most assuredly an example of defendants' "plugging the gaps of a lost motion with additional matters." *Learning Annex*, 860 F. Supp. 2d at 241.  Defendants did not raise Section 8-16 in their papers, and that argument is therefore waived here.  Defendants' contention that the TLC's policy of zero tolerance for licensees who operate their vehicles while impaired gave Ali fair notice is also unavailing because the policy is directed toward the operation of taxi vehicles while on duty and not one's personal car during off-duty hours, as was the situation with Ali. (*See* Pls.' 56.1 ¶ 152; Defs.' Resps. to Pls.' Post-Remand 56.1 Statement ¶ 152, Dkt. No. 167.)

### 4. *There is a genuine dispute of fact as to whether the drug test plaintiffs received fair notice of the specific drug found in their drug tests prior to their fitness hearings*

Finally, defendants contend that the Court should reconsider its grant of summary judgment to the drug test plaintiffs Rothenberg, Abood, Katsigiannis, and Doumbia on the claim that their hearing notices were constitutionally infirm for failing to disclose the specific drug found in their drug tests.  Defendants assert that the record contains "ample evidence" that plaintiffs were advised of the specific drugs found in their urine samples before their fitness hearings.  (Defs.' Mem. at 11.) Specifically, defendants point to the declaration of MRO Dr. Neil Dash, which states that upon receiving the final LabCorp drug test report, containing the amount found for each drug tested, the MRO would contact the TLC donor "to determine if a verifiable, valid medical reason exists to explain the substance(s) found in the specimen provided by the donor." (Declaration of Neil J. Dash, dated July 3, 2013 ("Dash Decl.") ¶¶ 5-6, Dkt. No. 155; Defs.' 56.1 ¶¶ 380-382.)

Defendants argue that the reference to "the substance(s) found" can only mean that the discussion with the TLC donor included the identification of the specific drug found in the licensee's sample; otherwise, it would be "nearly meaningless" to afford the licensee an opportunity to provide a medical explanation for the positive test result without specifying the drug found in the sample.  (Defs.' Mem. at 14.) Defendants point to Dr. Dash's interview notes, which state that Katsigiannis, Doumbia, and Rothenberg tested positive for cocaine or marijuana, respectively.  (Ex. D to Dash Decl.)  Dr. Dash also noted that Katsigiannis called back, denying the use of cocaine, which, defendants posit, Katsigiannis could not have done if he had not already been advised of the specific drug in his sample.  (Defs.' 56.1 ¶ 394; Dash Decl. ¶ 11.)

On reconsideration, the Court finds that it overlooked certain record evidence when the Court granted summary judgment in favor of the drug

test plaintiffs in its July 31 Opinion. (*See, e.g.*, Defs.' 56.1 ¶¶ 345, 380-82, 389-90, 393-95, 397; Defs.' Mem. of Law in Opp'n to Pls.' Renewed Mot. for Summ. J. at 27, Dkt. No. 168; *see also* Defs.' Mem. of Law in Support of Mot. for Summ. J. ("Defs.' SJ Mem.") at 17, Dkt. No. 158; Defs.' Reply Mem. of Law in Support of Mot. for Summ. J. at 7, Dkt. No. 177.)  In viewing the evidence in the light most favorable to defendants—the non-moving party on plaintiffs' motion for summary judgment, *see Tolan*, 134 S. Ct. at 1868— a reasonable juror was entitled to infer from Dash's testimony that the MRO informed plaintiffs of the specific drug found in their drug tests when the MRO called to tell them that they had failed the drug test and ask if there was a "verifiable, valid medical reason . . . to explain the *substance(s)* found in the specimen." (Dash Decl. ¶ 6 (emphasis added); *see also* Ex. D273 to Declaration of Amy J. Weinblatt, dated August 9, 2013, at 41, Dkt. No. 165-18 ("I contact the donor to give the donor the option and ability to verify why they have *this drug* in their urine." (emphasis added)).)

This reasonable inference is corroborated by (1) Katsigiannis' denial of cocaine use to the MRO, which he presumably would not have done if he had not already been told that he had tested positive for cocaine (Defs.' 56.1 ¶¶ 394-95; Dash Decl. ¶ 11), and (2) Rothenberg's testimony that he was told the amount of the drug in his drug test as well as the "passing mark," numbers which only makes sense in the context of his specific drug, marijuana. (Ex. D6 to Declaration of Amy Weinblatt, dated Oct. 15, 2009, at 62, 64-66, Dkt. No. 66-7; Defs.' 56.1 ¶¶ 116, 390; Ex. A to Dash. Decl.)  Defendants' expert also reported that the MRO "informs the individual of the drug(s) detected in the specimen . . . ." (Defs.' 56.1 ¶ 345; Ex. D197 to Declaration of Amy J. Weinblatt, dated July 12, 2013, at 8, Dkt. No. 157-12.)  While the Court does not find that the evidence is conclusive as a matter of law, a reasonable juror would be entitled to infer that each drug test plaintiff in fact was told the identity of the drug found in his drug test prior to his fitness hearing, and therefore the Court's grant of

summary judgment in favor of the drug test plaintiffs on the issue of the adequacy of the drug test plaintiffs' hearing notice was improper.[10]

Accordingly, the Court reconsiders its grant of summary judgment in favor of the drug test plaintiffs on the issue of whether they were adequately notified of the specific drug found in their drug tests prior to their fitness hearing and instead denies the drug test plaintiffs summary judgment.  The parties will go to trial on that issue.

### B.   Plaintiffs' Motion for Reconsideration is Denied

Plaintiffs' motion can be disposed of in short order since plaintiffs conceded at oral argument that their motion stems from the belief that the July 31 Opinion is wrong and will be reversed on appeal. (Sept. 9, 2014 Tr. at 10-12.)  They do not point to any facts or law overlooked by the Court but simply assert that plaintiffs have the right to go to trial on *all* of their allegations because they believe the Court incorrectly winnowed their claims in its July 31 Opinion.  The simple argument that plaintiffs believe the Court was incorrect, without setting forth controlling decisions or data overlooked, does not provide a basis for reconsideration.

Plaintiffs do purport to set forth "controlling" law on two fronts. Although plaintiffs argue that New York law forbids the Court from finding that a conviction for assault or possession of a forged instrument indicates a lack of good moral character, nothing plaintiffs cite supports that proposition.[11]  In the same vein, plaintiffs assert that the Court,

---

[10] In light of the factual issue of whether the MROs notified the drug test plaintiffs of the identity of the specific drug found in their drug tests, the Court is unable to judge the risk of erroneous deprivation from the absence of this information in the hearing notice.  As such, the Court cannot balance the remaining *Mathews* factors with respect to the adequacy of the hearing notice.

[11] For instance, plaintiffs point to New York Correction Law § 752, but that law affirmatively underscores that an official can make a finding of a lack of good moral

incorrectly and *sua sponte*,[12] declined to exercise supplemental jurisdiction over plaintiffs' state law claims.  But here again, the authority plaintiffs cite—*Carver v. Nassau County Interim Finance Authority*, 730 F.3d 150, 155 (2d Cir. 2013) and *City of Chicago v. International College of Surgeons*, 522 U.S. 156, 164–68 (1997)—merely confirms that a federal court may exercise supplemental jurisdiction over state law claims that could have been asserted in Article 78 proceedings, not that a federal court *must* exercise that jurisdiction.  Plaintiffs have provided no basis for the Court to reconsider its July 31 Opinion.

## IV. CONCLUSION

The Court grants defendants' motion for reconsideration (Dkt. No. 195) insofar as it finds that (1) the individual defendants are entitled to qualified immunity for their actions and (2) there is a factual question as to whether the drug test plaintiffs received notice of the specific drug found in their drug tests prior to their fitness hearings.  Summary judgment is therefore granted in favor of the individual defendants, dismissing them from this litigation, and summary judgment is denied to the drug test plaintiffs on the issue of the adequacy of the hearing notice to drug test plaintiffs.  Defendants' motion for reconsideration is otherwise denied. Plaintiffs' motion for reconsideration (Dkt. No. 197) is denied, as plaintiffs

---

character based on prior convictions and simply provides that such a finding should not be considered in certain circumstances, none of which apply here.

[12] Not only was the ruling not *sua sponte* (*see* Defs.' SJ Mem. at 33 (asking the Court to decline to exercise supplemental jurisdiction)), but also plaintiffs' contention that the court may not decline to exercise supplemental jurisdiction *sua sponte* contravenes black letter law.  *See Star Multi Care Servs., Inc. v. Empire Blue Cross Blue Shield,* 6 F. Supp. 3d 275, 293 (E.D.N.Y. 2014) *("[T]he Court sua sponte* declines to exercise supplemental jurisdiction over the remaining [state law] claims against [defendants].")*; Boggs v. Die Fliedermaus, LLP,* No. 99-cv-2451, 2004 WL 1554449, at *1- 3 (S.D.N.Y. July 7, 2004) (same); *see also Manway Constr. Co. v. Hous. Auth. of City of Hartford,* 711 F.2d 501, 503 (2d Cir. 1983).

have failed to identify any new factual matters or changes in controlling law that warrant reconsideration.

The Court also denies plaintiffs' request to re-depose Marc Hardekopf, the lead TLC prosecutor, because he has already been deposed twice in this action and plaintiffs have presented no valid reason to depose him yet again.

Dated:  New York, New York
        March 27, 2015

                                        SO ORDERED:

                                        Sidney H. Stein, U.S.D.J.